JUDGE BULLITT
delivered the opinion op the court:
Dawson made two contracts with the appellants, one in March, 1851, the other in January, 1852, by each of which he agreed to deliver to them, at the Crooked Creek Furnace, in Bullitt county, 50,000 bushels of good charcoal, for which they agreed to pay him 3-J- cents per bushel. Dawson sued upon said contracts, alleging that he had delivered 69,576 bushels under the first, and 56,887 bushels under the second contract; and that the appellants had not paid him therefor, but owed him abalance of $800 over and above what he had received from them under said contracts, for which he asked judgment. A demurrer to the petion having been overruled, the appellants filed an answer and counter-claim and an amended answer, in which they denied that Dawson had delivered the quantity of coal alleged by him, and stated that they had no knowledge nor information to form a belief as to the quantity he had delivered; and alleged that they had paid him, in money and merchandise, $3,522.46, which more than paid him for all coal delivered under said contracts; and asked for a judgment against him for such sum as might.be found in their favor upon trial. Dawson filed a reply, admitting that he had received pay for all the coal set forth in the petition except the amount of $800, which was, in effect, an admission that he had received more than the appellants alleged. Dawson obtained a verdict and judgment for $786.69, from which judgment this appeal was taken.
Upon the trial the defendants asked for an instruction, “that the plaintiff cannot recover in this action for more than 100,-000 bushels of charcoal, that being the amount specified in the two written contracts sued on;” and for another instruction, that “the plaintiff cannot recover in this case for more than 100,000 bushels, unless the defendants had knowledge of the delivery of the excess, and in such knowledge received the same,” both of which were refused. In our opinion, if the defendants received more coal than they were entitled to, they should pay'what it was worth, whether they had knowledge of the excess or not. But the petition laid no foundation for such recovery. It'declared upon the contracts, which entitled the plaintiff to only $3'.500, as pay for 100,000 bushels, and *123 contained no allegation as to the value of the coal, and the reply admits that the plaintiff had been paid for the 100,000 bushels. The plaintiff should have been allowed to amend his petition, but upon the pleadings as they stand he was not entitled to recover.
As the plaintiff will probably amend his petition upon the return of the cause, it is proper to notice other questions arising upon the record. Upon the trial the principal question was how much charcoal had been delivered. The defendants filed a statement showing the number of wagon loads received. The difficulty was to determine how many bushels the wagon contained.
Congress has not passed any law to fix the standard of weights and measures, as it is authorized to do by the Constitution. The laws of this State, therefore, govern the subject. But Professor Plassler, who was employed for that purpose by the Secretary of the Treasury, under a resolution of the Senate, adopted May 29, 1830, prepared standards of weights and measures, for the use of the custom houses; and by a joint resolution of Congress, adopted June 14, 1b36, the Secretary of the Treasury was directed to furnish a complete set of those weights and measures to the Governor of each State, “to the end that a uniform standard of weights and measures may be established throughout the United States.” These standards were adopted by the Legislature of Kentucky, by an act passed in 1839, (3 S. L., 583,) and by chap. 105, sec. 1, of the Revised Statutes, which declares that “the weights, measures and balances received from the government of the United States, now in the custody of the Secretary of State, shall continue in the custody of that officer, and shall be the standard of weights and measures in this State.” According to this standard, a bushel is a measure containing 77.6274 pounds avoirdupois of distilled water at the temperature of the maximum density of water and barometer 30 inches at 62 dg. Fahrenheit. (Homan’s Cyclopedia of Commerce, page 1943.) This, as is stated in Professor Alexander’s “universal dictionary of weights and measures,” is the same as the Winchester bushel, and contains 2150.42 cubic inches.
The contracts between the parties designated the place at *124 which the charcoal was to be made, and bound Dawson, to deliver it at the furnace of the appellants. There was evidence that the hauling of it caused it to settle, so that at the latter place it occupied only four-fifths of the space which it filled at the former. Our opinion is that the appellants were entitled to 100,000 bushels, by level measure, at the place of delivery. Upon this point the counsel for the parties agree, but they differ as to the number of such bushels that were delivered. The appellants filed a statement, the correctness of which was conceded, showing the number of wagon loads they had received. The dispute is as to the number of bushels contained in the wagon, and as to the mode of ascertaining the same, the appellants insisting upon gauging the contents of the wagon at the furnace, the appellee insisting upon what the witnesses call “dust-measure.” A bushel, according to “dust-raeasure,” is composed of a half bushel heaped and a half bushel filled to the level, at the pit where the coal is made, coal dust being used because the measurement can be made more accurately with it. than with lumps of coal.
Several witnesses testified that “dust-measure” at the pit would produce the same result as gauging the contents of the wagon at the place of delivery. One witness, Pittman, testified that he had ascertained the contents of the wagon by “dust-measure” at the pit, and the verdict of the jury appears to have been based upon his estimate. The evidence of Gun-ter and several other witnesses, who gauged the wagon, conduced to prove that it contained less than Pittman asserted. It is evident that Pittman made a mistake in measuring the coal-dust which the wagon contained; or that Gunter and several other witnesses made a mistake in measuring the wagon; or that Whitman and three other witnesses made a mistake in supposing that the two modes of measuring would produce the same result.
. In our opinion, the appellants were entitled to insist upon the latter mode of measurement, unless they agreed to the former mode, or unless the adoption of that mode was established by usage.
There was no evidence of such an agreement. On the *125 contrary, Whitman testified that, when the first contract was made nothing was said about the mode of measuring; and that before the making of the second contract be. an agent of the áppellants, told Dawson that they would insist on gauge measure. The fourth instruction for the plaintiff was erroneous, because it assumed lhat there was evidence conducing to prove that “dust measure” was “the mode of measuring coal understood by the parties in making the contract.”
There was evidence conducing to prove, that during eight or ten years before the appellants purchased the furnace, its previous owners usually purchased charcoal according to “dust measure.” But Whitman proved that the appellants rejected that mode and adopted gauge measure, and there was no contradictory evidence upon that subject, nor was there any proof, except the evidence of the former usage, that the appellants, when they made the first contract with Dawson, had any knowledge of that usage, or any reason to believe that Dawson contracted with reference to it; whilst Whitman proved, that, before the making of the second contract, Dawson was informed that the appellants' would insist on gauge measure. The general current of recent decisions shows a strong and increasing disinclination of the courts to allow the general laws of the country to be varied by proof of local usages./" Such an usage is binding only on the ground that the party, sought to be charged, contracted with reference to it. Hence it must appear that he had actual knowledge of it, or the evidence must be such as to clearly authorize the presumption that, he had knowledge of it, otherwise it cannot be supposed that he contracted with reference, to it. The general doctrine on this subject was thus stated in a recent case: “To make such a custom admissible it must be of such age, such uniformity of observance, such certainty and fixedness of character, and of such notoriety, that a jury would feel clear in saying that it was known to the party sought to be affected by it. (Huston, &c vs. Peters, &c., 1 Met. K. R., 562.) The fact that one party had knowledge of the usage, and supposed it would enter into the contract, is not sufficient, nor can it enter into the contract, though both parties had knowledge of it, if it appears that they did not contract with reference to it. The *126 first instruction for the plaintiff was erroneous: 1st. Because it did not discriminate between the first and second contracts. There was clearly no evidence authorizing the jury to find that the alleged usage entered into the second contract. 2d, Because the jury were told that “the usual mode of measuring coal at the Crooked Creek Furnace, at the time of the contract,” was the proper mode. There was, we believe, no evidence as to what was the usual mode of measuring coal at that furnace at the time of the first contract. The plaintiff’s evidence as to the usage related to the previous time, during which Baker and Quirey and Tyler owned the furnace. The instruction, in effect, assumed that the former usage continued to exist, and was binding on the appellants, though they may not have contracted wdth reference to it, and may not have had any knowledge of it, actual or implied.
It is argued by appellants’ counsel, that the court should not have permitted the jury to consider the evidence of the usage during the proprietorship of Baker and Quirey and Tyler, even with reference to the first contract, because, as is asserted, the appellants during that time were strangers, residing at a distance from the Crooked Creek Furnace, and consequently could not rationally be presumed to have had any knowledge of the usage. We need not express an opinion upon this point, because no motion was made to exclude the evidence, and it was not proved that the appellants, during the time referred to, were strangers, residing at a distance. It seems unnecessary to notice the other questions argued by counsel.
The judgment is reversed, and the cause remanded for a new trial and other proceedings, not inconsistent with this opinion.