## MODAWELL *vs.* HOLMES.

[FINAL SETTLEMENT OF GUARDIAN'S ACCOUNTS.]

1. *Parties to appeal, and security for costs.*—From a final decree of the probate court against A. H. a *non compos mentis*, to be levied of the goods and chattels &c. of the said A. H. in the hands of his guardian, W. B. M., an appeal may be prosecuted "by W. B. M. as guardian of A. H."; and if the clerk's certificate states "that the said W. B. M.

gave A. B. as security for the costs of said appeal," this is a substantial compliance with the requisitions of the statute.

2. *Non compos mentis guardian ; settlement of accounts of.*—If a guardian becomes *non compos mentis* without having settled his accounts, the probate court may compel or allow a settlement of his accounts by his guardian ; the proceedings being conducted in the name of the *non compos* guardian by his guardian, and the decree for any balance found against him being rendered against him individually, to be levied of his goods and chattels in the hands of his guardian.

3. *Conclusiveness of final decree.*—A decree of the probate court, rendered on final settlement of an administrator's accounts and vouchers, is conclusive until reversed; and if the administrator is also the guardian of the sole minor distributee of the estate, he cannot be charged, in a subsequent settlement of his accounts as guardian, with the value of assets which were not accounted for on his settlement as administrator, although the other distributee appears in open court, and releases all his interest to the said minor.

4. *Judicial notice of public currency.*—The appellate court cannot take judicial notice of the extent of the depreciation of the currency during the late war.

5. *Allowance of counsel fees to guardian.*—To entitle a guardian, on final settlement of his accounts, to an allowance for counsel fees, he must show that he has already paid them.

APPEAL from the Probate Court of Dallas.

IN the matter of the final settlement of the accounts and vouchers of Anderson Holmes, as guardian of William Holmes, a minor, by William B. Modawell, guardian of the person and property of said Anderson Holmes, who had been declared *non compos mentis.* William Holmes, the infant, was the only child of William P. C. Holmes, deceased ; and he and his mother, Mrs. Mary C. Holmes, the widow of said decedent, were the only distributees of said estate. Anderson Holmes was appointed guardian of said William Holmes, by said probate court, on the 18th December, 1854. The record does not show when said Anderson Holmes was declared *non compos mentis*, nor does it set out any of the proceedings had before said probate court in that matter. The account-current for the settlement of the guardianship of said minor was filed by said Modawell, as guardian of said Anderson Holmes, on the 9th April, 1866; and the minute-entry states that, "objections being made by B. H. Craig, the guardian *ad litem* of said William Holmes," the

hearing of the application was continued until the 15th day of May, 1866 ; but the objections to the account are nowhere stated in the record.   The decree of the court on the settlement, and the bill of exceptions reserved on the part of the guardian, are as follows :

"Probate Court, May 17, 1866.   This being the day set apart by previous order of continuance for the final settlement of the accounts of Anderson Holmes, as guardian of William Holmes, a minor child of W. C. P. Holmes, deceased, came William B. Modawell, who is the guardian of the person and estate of said Anderson Holmes, who has been declared to be *non compos mentis* ; and William Holmes, the ward, was represented by B. H. Craig, his guardian *ad litem*, and by his attorney.   And the said William B. Modawell, as the guardian of said Anderson Holmes, having heretofore, on the 9th day of April, 1866, filed his account-current of the guardianship of Anderson Holmes on the estate of his ward, William Holmes, and exceptions being filed thereto by the guardian *ad litem* of said William Holmes, the same were submitted to the court, on the evidence adduced by both parties ; and, as a part of the evidence in the cause, Mrs. Mary C. Holmes, the mother of said William Holmes, and the only other person interested in the estate of W. C. P. Holmes, deceased, her late husband, and the father of said William Holmes, appeared in open court, and relinquished to said William Holmes all her interest, of all and every kind and character, in and to any and all property or moneys, rights and credits, left in the hands of said Anderson Holmes, as the administrator of the estate of the said W. C. P. Holmes, deceased, or in any other capacity.   And upon consideration of the evidence, the court stated an account against said Anderson Holmes, of his guardianship for said William Holmes, which is ordered to be recorded ; whereby it appears that, after the allowance of all just credits to the said Anderson Holmes, he is this day indebted to said William Holmes in the sum of eight thousand and eighty-one 13–100 dollars ; and it appearing that Mary C. Holmes has been duly appointed and qualified as the guardian of said William Holmes, it is ordered, adjudged, and decreed by the court, that said Mary

C. Holmes, as guardian, have and recover of the said Anderson Holmes the said sum of eight thousand and eighty-one 13-100 dollars; for which execution may issue against the good and chattels, lands and tenements of the said Anderson Holmes, in the hands of his guardian, William B. Modawell."

"Be it remembered that, on the trial of this cause, the following proceedings were had: It appearing in evidence that William Holmes, the infant, was the owner of the following slaves, to-wit, Amos, Satira, Henry, Doctor, Moses, Jane, Lena, and Martha; four of whom, to-wit, Amos, Moses, Satira, and Jane, were grown, and for whose annual hire the guardian charged himself in the account; the contestant introduced the following testimony in support of his exceptions: It was proved that Anderson Holmes became the guardian of said William Holmes on the 18th December, 1854; and that the said slaves were kept together and worked, with other negroes, on the plantation of said Anderson Holmes, on which he resided, from the 18th December, 1854, until the close of the late war, in April, 1865. The contestant read in evidence, also, the record of the proceedings had in the probate court of said county, showing that no order had ever been made allowing the guardian to keep said slaves in his possession; but the guardian made annual settlements in 1855, 1857, and 1859. *J. Lee*, a witness for the contestant, testified, that negro men, good field-hands, hired in 1858 and 1859, at from one hundred and fifty to two hundred dollars *per annum*, and women at from one hundred to one hundred and twenty-five dollars; that he hired a negro woman who was a fair field-hand, in 1864, for seventy-five dollars, payable in Confederate money; that he resided in the neighborhood of said Anderson Holmes, and considered the foregoing fair prices in that neighborhood; and that the hire of negroes by the year, during the war, amounted to about the same price in Confederate money, in his judgment, as they were worth in good money before the war. *Mrs. Mary C. Holmes* testified, on the part of the contestant, that said Amos and Moses were worth about two hundred dollars *per annum* before the war, and Satira and Jane about one

hundred and twenty-five each; that she did not know what they were worth during the war, but they were not worth as much as before the war. *H. D. Corley* testified, on the part of the contestant, that Amos and Moses were each worth, in 1857, from one hundred and fifty to two hundred dollars; that first-class women, field-hands, were worth that year from one hundred and thirty to one hundred and fifty dollars; and that he did not know what such negroes were worth during the war, but they were not worth so much. Said Modawell asked said Corley this question, 'Considering the ages and condition of all the negroes, the amount necessary to expend in clothing and feeding them, paying their doctor's bills and taxes, and taking care of the children, were they all worth more than two hundred dollars *per annum*?' The contestant objected to this question, on the ground that it called for the conclusion of the witness; which objection the court sustained, and refused to permit the witness to answer the question; to which the said Modawell excepted. Before this question was put to said witness, several other witnesses had testified, at the instance of said Modawell, as to the value of keeping and raising the young negroes, and the time when they would be old enough to earn their own living; and the court stated, that the witness might testify as to the hire of each negro, and the amount that ought to be allowed for raising the young negroes. *J. T. Cain*, a witness for said Modawell, testified, that he hired a negro woman for the year 1863, for forty dollars; that he hired two women and a man, in 1864, for three hundred dollars, and a man, a woman, and girl, in 1865, for four hundred dollars; that these prices were payable in Confederate money; that said negroes were fair field-hands, and were hired in the neighborhood of said Anderson Holmes; that the above prices were fair and reasonable for such negroes, and were such as were usually given during those years; that he resided in the neighborhood of said Anderson Holmes; and that negroes were worth, during the war, about what was necessary to feed, clothe, and support them, and pay their doctor's bills and taxes. *Jacob Givhan*, another witness for said Modawell, testified that, in 1863, he hired two women and a

plow-boy, for two hundred and fifty dollars ; that in 1864, he hired two women for one hundred and sixty dollars; that these negroes were fair field-hands, and the prices paid for them were reasonable, and such as were usually paid in that neighborhood, and that he resided in the neighborhood of said Anderson Holmes. The above being, in substance, all the material evidence relating to the value of the hire of the negroes, the court thereupon charged the guardian with the sum of three hundred and thirty-seven 50-100 dollars, for the hire, during each of the years 1862, 1863, and 1864, and with one hundred and five 50-100 dollars, for the year 1865; to each of which said charges said Modawell excepted."

" In order to charge the guardian with the value of a slave named Charles, the contestant proved, that said Anderson Holmes was appointed administrator of the estate of W. C. P. Holmes, deceased, by said probate court of Dallas, on the 20th June, 1853; and then introduced in evidence the inventory and appraisement of said estate, whice was returned into court by said administrator, under oath, and dated the 9th of August, 1853. On the list of slaves in said inventory and appraisement, was a negro by the name of Charles, valued at eight hundred dollars ; and the following certificate was appended by the appraisers : 'Charles is appraised, although the question of ownership is not decided by the administrator or appraisers. This boy has been, for several years, in the possession of said W. C. P. Holmes, although, at the time he obtained the possession, it was agreed that he was to pay A. Holmes for him, which he has never done. The question of ownership is submitted to the judge of the probate court.' The contestant then introduced a witness who testified, that Charles was in the possession of said W. C. P. Holmes for more than three years next preceding his death, and was kept at work on the plantation of said Anderson Holmes, from the death of said W. C. P. Holmes, to the 28th April, 1865; that said W. C. P. Holmes took said negro home at the same time he took the others mentioned in the appraisement, and kept him, and worked him, and claimed him as he did the others ; that said negro was in his possession

when he died, and was taken by Anderson Holmes, two days afterwards, to his own place, with the other negroes belonging to said estate. Said Modawell then introduced evidence showing that said slave, before he went into the possession of said W. C. P. Holmes, belonged to said Anderson Holmes; that said Anderson, as the administrator of said W. C. P. Holmes, applied to said probate court, and obtained an order to distribute the slaves of said deceased between his widow, Mrs. Mary C. Holmes, and said William Holmes, the sole distributee of said estate; that commissioners were appointed by said court, on the 8th November, 1853, to make said division; that said commissioners made their report to the January term of said court, 1854, which was received, confirmed, and ordered to be recorded." The report of said commissioners was read in evidence by said Modawell, showing that no slave by the name of Charles was included in said division. He also proved, that Anderson Holmes afterwards filed his accounts and vouchers for a final settlement of his administration on said estate; and that said probate court rendered a final decree on said settlement at its December term, 1854, which decree was read in evidence by said Modawell. "It appeared in evidence, also, that said slave was not mentioned or referred to in said account; and that said Anderson Holmes did not retain anything in payment of said slave on account of said alleged sale to W. C. P. Holmes."

The decree rendered on said final settlement was in the following words: "In the matter of the final settlement of the estate of W. C. P. Holmes, deceased. This day came Anderson Holmes, the administrator of said estate; and it appearing to the satisfaction of the court that due and legal notice of this final settlement of said estate had been advertised in the *Dallas Gazette*, a newspaper published in Cahaba, for three weeks previously, and that the proceedings herein are all regular, on motion it is ordered, that Lorenzo Roberts be appointed guardian *ad litem* for the minor heirs of said deceased, to defend herein on this settlement; and he, being present, consented to act. And thereupon the account-current and vouchers of said administrator were taken up, examined, contested, audited, al-

lowed, and passed; by which said account-current it appears, that assets to the amount of $933.47 had come into the hands of said administrator, and that he had disbursed and paid out, as per vouchers filed and numbered from one to twenty-two, inclusive, the sum of $713.37, which, being deducted, leaves the sum of $222.10 ; and it further appearing to the court that the heirs of said estate are two in number, to-wit, Mary C. Holmes, the widow, and William Holmes, the infant son of said deceased, and that another child of said deceased has died since the death of said intestate, and that the share of said deceased child falls to the share of said William Holmes, and that the said sum of $222.10, divided into three shares, gives to each the sum of $74.03⅓: It is therfore ordered by the court, that Mary C. Holmes have and recover of the said administrator the sum of $74.03⅓, for which execution may issue; and thereupon said administrator files here in court the receipt of the said Mary C. Holmes, in full of her distributive share of said estate ; and it is therefore ordered by the court, that said decree be, and the same is hereby, satisfied. It is further ordered and decreed by the court, that William A. Holmes have and recover of the said administrator the sum of $146.08⅔, it being the other two-thirds of said balance; and it appearing to the court that said administrator is the legally appointed guardian of the said William A. Holmes, it is therefore [ordered] that he retain in his hands, as such guardian, the said sum of $146.08⅔. Ordered, that the said account-current be recorded, and the vouchers filed, &c. ; and that said estate be hence and forever finally settled."

" The guardian claimed to be allowed a reasonable attorney's fee, for services on said settlement ; and introduced evidence showing that he was represented on said settlement by F. M. Dansby, an attorney-at-law, and that his services therein were reasonably worth two hundred dollars. This being, in substance, all the material evidence in the cause in reference to the matters in dispute, the court thereupon charged the guardian with the sum of eight hundred dollars, as the value of the negro Charles, together with compound interest thereon, and refused to allow the

guardian credit for said attorney's fee; to which rulings and decisions, separately, said guardian excepted."

The probate judge states, in his final certificate appended to the transcript, "that an appeal from the said decree was taken by W. B. Modawell, as guardian of Anderson Holmes, a *non compos mentis*, on the 24th May, 1866; and that the said William B. Modawell thereupon gave A. B. Cooper as security for the costs of said appeal, which security was approved." The assignments of error are in the name of "William B. Modawell, as guardian of Anderson Holmes," and are twelve in number. The first and sixth assignments are, the charge against the guardian of the value of the negro Charles; the second, third, fourth, and fifth, the charges of negro hire during the years 1862, 1863, 1864, and 1865; the seventh, the charge of interest; the eighth, the refusal to allow an attorney's fee; the ninth, the final decree; the tenth and eleventh, that the court had no jurisdiction; and the twelfth, the sustaining of the objection to the question propounded to Corley. The appellee submitted a motion to dismiss the appeal.

W. M. BROOKS, for appellant.
MORGAN & LAPSLEY, *contra.*

BYRD, J.—1. The appeal was taken, and security for costs thereof was given, in substantial conformity to law; and the motion of the appellee to dismiss the appeal is overruled.

2. It is contended that the probate court had no jurisdiction to settle the guardianship of a guardian who, before settlement, becomes a *non compos mentis*, upon an account filed by the guardian of the latter. There is no statute which, in express terms, confers such jurisdiction, it may be conceded. But it is argued that, under the general authority conferred by the Code on the probate court, it has jurisdiction to make such a settlement. There is no adjudication of this court which throws any light on the question, and the counsel for the parties, in their elaborate briefs, have not referred to any case or authority, in England or America, which has discussed or settled the

question or practice in such cases; and we have been unable to find any. No case or authority has touched upon the question, how the accounts of a guardian or administrator, who becomes *non compos mentis* after obtaining letters, are to be settled. No doubt such cases have arisen and been decided, but we have not found them in the books. We shall, therefore, proceed upon principle and the analogies of the law to dispose of this question.

In England, the crown originally had the right to dispose of the guardianship of all idiots and persons *non compotes mentis ;* and a bailiff was appointed to take the control of the estate and person of such persons. Afterwards, by acts of parliament, the duty or jurisdiction of the appointment of a committee for such persons was conferred on the lord-chancellor, and the committee acted subject to the control of the court of chancery.

In New York, the exclusive jurisdiction over such persons and their estates is conferred on the court of chancery, and all claims or debts against them are collectable exclusively by filing a petition in the court making the appointment of the committee, for that purpose.—*In re Fitzgerald,* 2 Sch. & Lef. 451; 1 Shar. Black. Com. 303, 306; *La Moureaux v. Crosby,* 2 Paige, 422; *In re Hopper,* 5 Paige, 489. But an action may be sustained in the name of the *non compos,* to recover property belonging to him, or a debt due him, and not in the name of his committee.—*Lane & Gros v. Schermerhorn,* 1 Hill, 97; *Crane v. Anderson,* 3 Dana, 119; *Petrie et al. v. Shoemaker,* 24 Wendell, 85; *Latham v. Wiswall,* 2 Ired. Eq. 294; *Cameron's Com. v. Pottinger,* 3 Bibb, 11.

In this State it has been decided, that a *non compos* may be sued, and that the court should appoint an attorney to make defense for him.—*Walker v. Clay & Clay,* 21 Ala. 804; *Ex parte Northington,* 37 Ala. 496. But it has never been decided by this court how a suit should be brought, to recover property belonging to a *non compos,* or a debt due to him. Neither has it been settled, by statute or adjudication, how the administration or guardianship of such a person upon the estate of another is to be settled, unless the general powers conferred on the probate court by the Code does so.

There is no general and plenary jurisdiction conferred on the probate court, over the persons and estates of lunatics or persons of unsound mind. The term "orphans' business" in the constitution of the State does not include such persons or their estates. The jurisdiction is not constitutional, but purely legislative, limited, and special; that is, so for as the statute law confers jurisdiction on the probate court, it can go, but no farther.—*Rambo v. Wyatt's Adm'r*, 29 Ala. 510.

We will now notice the extent of the jurisdiction of that court given by statute, so far as applicable to the point under consideration. Section 670 of the Code confers on the probate court *original jurisdiction* to appoint and remove guardians for minors and persons of unsound mind, and to decide " all controversies as to the right of guardianship and the settlement of guardian accounts." Section 672 confers on such courts full powers to enforce the jurisdiction with which the statute law clothes them. Chapter 3, of title 5, part 2, of the Code, (p. 385,) and chapter 11, title 2, part 3, (p. 499,) taken together with sections 670 and 672, confer all the jurisdiction the probate court has over the persons and estates of persons of unsound mind. A statute, passed since the adoption of the Code, confers jurisdiction upon the probate court to make settlement of the guardianship of a ward, after the death of the guardian, with the executor or administrator of such guardian. This statute is general, and applies to guardians of persons *non compos*, as well as other guardians.—Pamph. Acts 1853–54, page 24.

If Holmes, the guardian in this case, had died after inquisition found and appointment of a guardian for him, and before a settlement of his guardianship, it is evident that his personal representative could have settled the guardianship in the probate court, under the provisions of the statute last referred to. If Holmes had become insane, pending a final settlement of his guardianship in the probate court, on an account filed by himself while sane, it would, upon principle, have been competent for the probate court to have appointed an attorney, or to have allowed his guardian, if one had been appointed, to conduct the

settlement to a final decree. And if a guardian becomes *non compos*, without having filed an account for a final settlement, it seems to us that the probate court, under the provisions of the Code, had the authority, after inquisition found, to appoint a guardian for him, and require a bond as prescribed by law (Code, p. 500); and the court had the authority also to require, by appropriate process, (Code, § 672,) the *non compos* guardian to make a settlement of his guardianship; and after service of process, it would be the duty of the court to appoint an attorney, or his guardian, to make answer to the process and proceed with the settlement. The better practice, under our law, would be to appoint the guardian of the *non compos* to conduct the settlement; for the reason, that he is entitled to the custody of the papers and property of his ward, and has given bond for the faithful discharge of his duties, (Code, § § 2754, 2755,) and he is also an officer of the court, *pro hoc vice*, and subject to its control.

A guardian of a *non compos*, under our Code, has substantially all the powers, and sustains all the relations, of a committee in England, though the jurisdiction of the probate court over the estate and person of the *non compos*, or over the guardian, is not as general and plenary as is that of the court of chancery in the mother country.

If, then, the *non compos* guardian could be required to settle his guardianship by the probate court, through his guardian, we see no reason why he could not by his guardian proceed to make the settlement, without awaiting the issuance of process to compel him to do so.—*McLeod v. Mason*, 5 Porter, 223. A guardian of a *non compos* may commence a suit in the name of his ward, just as a guardian of a minor might. Section 2036 of the Code does not authorize a suit in the name of the guardian in every case, nor in a case like this. The qualifying phrase, "in all cases where the ward has an interest, and the judgment enures to his benefit", limits the cases in which the guardian *may* bring the suit in his own name.

In the case of *Beale et al. v. Coon*, (2 Watts' R. 183,) Sergeant, J., in delivering the opinion of the court, says: "All actions by or on behalf of a lunatic, placed by law in

the care of a committee, must be in the name of the lunatic and the committee. The latter must join, to manage the interests of one who is disabled to protect himself; and the lunatic must be joined, because he may recover his understanding, and then is to have the management and disposal of his estate. He resembles, as to this, an infant, who always appears by guardian or next friend." This adjudication is altogether in harmony with our statute law on the subject, and the views we have expressed thereupon. If the *non compos* is restored to soundness of mind, the statute provides for the restoration of his property, and, of course, the discharge of his guardian; and all suits would proceed in the name of the *lunatic*, and not of the guardian. If they were commenced in the name of the latter, the statute does not provide whether they shall *abate* upon the return of sanity, or how they shall proceed to a final determination. However this may be, we hold in this case, that the record substantially shows that the account was filed in the name of the *non compos* guardian, by his guardian, and that settlement proceeded to a final decree thereon, and that the appeal, as shown in the bill of exceptions, was taken in the same manner, and the security for the costs of the appeal is in substantial conformity to law. It is true, W. B. Modawell signs the obligation for costs of appeal, as guardian of Anderson Holmes; but this is mere *descriptio personæ*, and does not designate him as the appellant. Such an obligation is sufficient, without being executed by the appellant.

Without extending this review of the decisions and statutes upon this question, we are satisfied that, upon principle and the analogies of the law, the probate court had jurisdiction to call the *non compos* guardian to a settlement, and to proceed, as above indicated, to a final decree; and having such jurisdiction, it may entertain it over an account filed by such guardian, by his guardian or committee. And such, too, we are inclined to hold, would be the law with reference to the settlement of the administration of an administrator who became *non compos* after grant of letters and before a settlement.

This view disposes of the 11th assignment of error, and

also of the 10th, in connection with the assertion that the court below properly rendered a final decree against the *non compos* guardian; if any final decree against him should have been rendered, which will depend, perhaps, on the disposition which this court shall make of the questions raised by the other assignments of error. This conclusion, we are of opinion, is sustainable upon the authority of the case of *Walker v. Clay & Clay, (supra,)* and other cases cited.

3. The other assignments of error we will proceed to dispose of in the order in which they are presented on the record. The court charged the guardian with the value of a slave named Charles, who, it is contended, belonged to one W. C. P. Holmes, deceased, at his death, and upon whose estate Anderson Holmes, the guardian, administered; and his ward, William Holmes, was a distributee of that estate. It appears that Anderson Holmes, in 1854, made a settlement of his administration upon the estate of W. C. P. Holmes, deceased, which we hold, upon the face of the decree, to be a final settlement. It further appears that, prior thereto, under an order of court, the slaves belonging to W. C. P. Holmes, deceased, had been divided among the distributees; but no notice is taken of the slave Charles, nor was he accounted for on the final settlement.

We know of no principle of law, which authorizes the probate court, after a final decree upon a final settlement of an administrator, to charge the administrator, in any proceeding thereafter as such, or as guardian of a distributee, or in any other capacity, with assets of the estate not embraced in the settlement. That settlement is conclusive on all parties thereto, so long as it remains unreversed and in force. The final decree introduced in evidence is not void on its face, and cannot, therefore, be collaterally impeached. If the administrator fails to account for all property of the estate on a final settlement, the law provides a remedy to the distributees.—Code, §§ 1915, 1916. As to the parties to the record, a final settlement in the probate court must be treated as conclusive; and that court has no authority to review or revise in any way its final decree, after the expiration of the term at which it is rendered.—*Slatter and Wife v. Glover*, 14 Ala. 650; *Watts et*

*al. v. Gayle & Bower*, 20 Ala. 817 ; *Watt's Adm'r v. Watt's Distributees*, 37 Ala. 546.

This disposes of the 1st and 6th assignments, and the 2d, 3d, 4th, and 5th, may be considered together.

4. After a careful scrutiny of the evidence, we can not see that the court erred in charging the guardian with hire of the slaves for the year 1862, 1863, 1864, and 1865, or the amounts charged for each year. On the other hand, under the evidence, we are of opinion that the decision of the court was as favorable in its conclusion on this matter to the guardian as he had any right to claim. We cannot say, upon the evidence, that, under the third section of the 26th ordinance of the convention of 1865, the court charged the appellant with more hire for those years than the appellee was "legally, justly, or equitably entitled to receive"; even if that ordinance has any application to this case ; nor can we take judicial notice of the extent of the depreciation of the currency.

The only exception taken as to a charge of compound interest, was that on the value of Charles; and as appellant is not chargeable, on the evidence, with that value, it follows that he was not with the interest thereon. The 7th assignment seeks to raise a question which does not appear from the record to have been a "matter in dispute" in the court below, and we will not pass upon it.

5. The court did not err in refusing to allow attorney's fees.—*Bates, adm'r v. Vary, adm'r*, decided at present term.

As to the question propounded to the witness Corley, we deem it unnecessary to say anything, as it may not be asked again under the same circumstances or state of proof.

For the error in charging the guardian with the value of the slave Charles, the decree of the court must be reversed, and the cause remanded.