## OHIO BELL TELEPHONE CO. *v.* PUBLIC UTILITIES COMMISSION OF OHIO.

No. 539.   Argued April 6, 7, 1937.—Decided April 26, 1937.

*Messrs. W. H. Thompson* and *Karl E. Burr,* with whom *Messrs. W. B. Stewart, Ashley M. Van Duzer, Thomas V. Koykka,* and *Charles M. Bracelen* were on the brief, for appellant.

*Mr. Donald C. Power* and *Mr. W. W. Metcalf,* Assistant Attorney General of Ohio, with whom *Messrs. Herbert S. Duffy,* Attorney General, and *A. F. O'Neil,* Assistant Attorney General, were on the brief, for appellee.

MR. JUSTICE CARDOZO delivered the opinion of the Court.

The rates chargeable by the appellant, the Ohio Bell Telephone Company, for intrastate telephone service to subscribers and patrons in Ohio are the subject-matter of this controversy.

Appellant was reorganized in September, 1921, by consolidation with the Ohio State Telephone Company, till then a competitor. Soon afterwards it filed with the Public Utilities Commission of the state schedules of new rates to be charged in those communities where an increase was desired for the unified service. Except in the case of toll charges the rates were not state-wide, but were separately stated for each of the company's exchanges, of which there were many. By the statutes then in force (the Robinson law, passed December 19, 1919, 108 Ohio Laws 1094, as amended by the Pence law, passed April 4, 1923, 110 Ohio Laws 366), the operation of an increase might be suspended for 120 days, at the end of which time the rate was to go into effect upon the filing of a bond for the repayment to consumers of such portion of the increased rate as the Commission upon final hearing should determine to have been excessive, with interest thereon. Construing these statutes the Ohio courts have held that a refund must be limited to rates collected under a bond, jurisdiction being disclaimed when that condition was not satisfied. *Lima* v. *Public Utilities Comm'n,* 106 Ohio St. 379, 386; 140 N. E. 147; *Great Miami Valley Taxpayers Assn.* v. *Public Utilities Comm'n,* 131 Ohio St. 285, 286; 2 N. E. (2d) 777. Some of the new exchange schedules were the subject of protests, and in proceedings to revise them (known as Pence Law proceedings) were made effective by bonds, a separate one for each exchange. Protest was also aimed at the new schedule for toll service which was to apply throughout the state. On the other hand, schedules for other exchanges became effective without protest and therefore without bond, and are not now at issue.

By October 1924, thirty-one Pence law proceedings aimed at separate exchanges had been begun, but had not been fully tried. Already several thousand pages of testi-

mony had been taken and many exhibits received in evidence. Soon afterwards, twelve additional proceedings were begun, making the total number forty-three, exclusive of the toll case. Two other proceedings were started later on. While the number stood at forty-three, the Commission of its own motion, by order dated October 14, 1924, directed a company-wide investigation of appellant's property and rates, and consolidated the bond cases therewith. The order recites that in all the pending proceedings the important issues are identical, and that a single consolidated case will enable rates to be determined for all services within the state at a minimum expenditure of time and money. Accordingly, the company was required to file with the Commission on or before December 1, 1924, a complete inventory of all its property, used and useful in its business, and upon the filing of such inventory, the consolidated case was to "proceed to a hearing for the determination of the fair value of said property and of the just and reasonable rates for the service thereby to be furnished by said company to its patrons throughout the state of Ohio." The state-wide investigation thus initiated, as distinguished from the Pence Law proceedings consolidated therewith, had its legal basis in provisions of the General Code of Ohio (§ 499–8, 499–9), and its scope was confined to the rates chargeable in the future (§ 614–23), the Pence Law being the basis for any refund of rates collected in the past. The statute (§ 499–9) makes it mandatory that in fixing rates for the future, the Commission shall ascertain the value of the property as "of a date certain" to be named. The date adopted for that purpose was June 30, 1925.

The company filed an inventory as required by the Commission with supplemental inventories every six months thereafter showing additions and retirements. A long investigation followed, the evidence being directed

in the main to the value of the property on the basis of historical cost and cost of reproduction, and to the deductions chargeable to gross revenues for depreciation reserve and operating expenses generally. As early as February, 1927, the case was submitted to the Commission for the fixing of a tentative value as of the date certain, a tentative value being subject under the Ohio Code to protest and readjustment. At the request of the Attorney General, however, the proceeding was reopened and new evidence introduced. At last, on January 10, 1931, the Commission announced its tentative conclusion. The valuation then arrived at was $104,282,735, for all the property within the state, whether used in interstate or in intrastate business. Protests were filed both by the company and by the state and municipalities. They were followed by new hearings. On January 16, 1934, the Commission made its findings and order setting forth what purports to be a final valuation. The intrastate property as of June 30, 1925, was valued at $93,707,488; the total property, interstate and intrastate, at $96,422,-276.

The Commission did not confine itself, however, to a valuation of the property as of the date certain. It undertook also to fix a valuation for each of the years 1926 to 1933 inclusive. For this purpose it took judicial notice of price trends during those years, modifying the value which it had found as of the date certain by the percentage of decline or rise applicable to the years thereafter. The first warning that it would do this came in 1934 with the filing of its report. "The trend of land valuation was ascertained," according to the findings, "from examination of the tax value in communities where the company had its largest real estate holdings." "For building trends resort was had to price indices of the Engineering News Record, a recognized magazine in the field

of engineering construction." "Labor trends were developed from the same sources." Reference was made also to the findings of a federal court in Illinois (*Illinois Bell Telephone Co.* v. *Gilbert,* 3 F. Supp. 595, 603) as to the price levels upon sales of apparatus and equipment by Western Electric, an affiliated corporation. The findings were not in evidence, though much of the testimony and exhibits on which they rested had been received by stipulation for certain limited purposes, and mainly to discover whether the prices paid to the affiliate were swollen beyond reason.* Cf. *Dayton Power & Light Co.* v. *Public Utilities Comm'n,* 292 U. S. 290, 295. The Commission consulted these findings as indicative of market trends and leaned upon them heavily. By resort to these and cognate sources, the value at the beginning of 1926 was fixed at 98.73% of the value at the date certain; the 1927 value at 95.7%; the 1928 value at 95%; the 1929 value at 96.3%; 1930 value at 92.2%; the 1931 value at 86.6%; the 1932 value at 76.8%; the 1933 value at 79.1%. Upon that basis the company was found to have been in receipt of excess earnings of $13,289,172, distributed as follows: for 1925, $1,822,647; for 1926, $2,041,-483; for 1927, $1,986,610; for 1928, $1,925,301; for 1929,

---

*The stipulation states that the testimony and exhibits "shall, however, be considered upon four issues involved in this cause and four only, viz:

"1. The earnings of the Western Electric and the reasonableness of such earnings.

"2. The cost to the American Telephone and Telegraph Company of rendering services under the license contract and the reasonable amount which should be allocated in that respect to The Ohio Bell Telephone Company.

"3. The separation and apportionment of the property, revenues and expenses of The Ohio Bell Telephone Company as between its intrastate and interstate property, revenues and expenses.

"4. Rate of return."

$1,463,347; for 1930, $1,481,689; for 1931, $1,659,760; for 1932, $908,335; for 1933, nothing. The excess was arrived at by figuring a return of 7% upon the value as a reasonable rate for the years 1925 to 1929, inclusive; 6.5% for the years 1930 and 1931; and 5.5% for the years 1932 and 1933. There being no excess revenue for the year 1933, the last year covered by the report, the Commission did not fix any percentage of reduction for the rates in future years. It did, however, prescribe a refund of the full amount of the excess for the years in which excess earnings were found to have been realized. The state-wide proceeding to fix rates for the future on the basis of a date certain was thus transformed finally into a refund proceeding, similar in function to proceedings under the Pence law for the refund of charges collected under bonds. The report of the Commission determining the excess was signed by a majority of the members, the Chairman dissenting. It was accompanied by an order similar in tenor.

The company protested and moved for a rehearing. In its protest it stated that the trend percentages accepted in the findings as marking a decline in values did not come from any official sources which the Commission had the right to notice judicially; that they had not been introduced in evidence; that the company had not been given an opportunity to explain or rebut them; and that by their use the Commission had denied a fair hearing in contravention of the requirements of the Fourteenth Amendment. Demand was made that an opportunity be conceded for explanation and rebuttal; demand was made also that the company be permitted to submit evidence showing separately for each year the fair value of its property, its revenues, expenses and net income in each of the several cases wherein rates had been collected under bond. This last was a renewal of a demand which had been made several times in the

course of the inquiry, as the Commission in its report concedes. By order dated March 1, 1934, the protests were overruled, and the demands rejected. By order dated July 5 of the same year the Commission modified to some extent its findings as to the excess income referable to bonded rates, and directed the company to show cause why refunds of the excess should not be made upon that basis. Again there was protest with a renewal of the request that evidence be received along the lines already indicated. Again the Commission reaffirmed its previous position.

The outcome of these manoeuvres was the filing of a final order, dated September 6, 1934, apportioning the excess income between bonded and non-bonded rates by allocating to the former class a total of $11,423,137 for exchange subscribers and $409,127 for toll patrons (in all $11,832,264) and directing payment accordingly. Distribution was to be made among the several exchanges upon the basis of the percentage relation of the gross exchange revenues in the exchanges where bonds were in effect to the total gross exchange revenues, bonded and unbonded. If even a single rate in a particular exchange, e. g., in the city of Cleveland, had been collected under bond, all the revenues of that exchange were included in reckoning the percentage of the total that should go to the Cleveland customers. So much of the excess as was not used up in that way was apportioned to the tolls. This method of allocation was made the subject of another protest, the company insisting that it was arbitrary and unequal and a denial of due process. Petitions in error were filed with the Supreme Court of Ohio in accordance with the state practice (General Code, § 544 et seq.) to review the final order of September 6, 1934, and the several intermediate orders supporting it. There was timely and adequate assertion of the infringe-

ment of the petitioner's rights under the Fourteenth Amendment. The Supreme Court of Ohio affirmed with an opinion per curiam. 131 Ohio St. 539; 3 N. E. (2d) 475. The case is here upon appeal. Judicial Code, § 237, 28 U. S. C. § 344.

*First:* The fundamentals of a trial were denied to the appellant when rates previously collected were ordered to be refunded upon the strength of evidential facts not spread upon the record.

The Commission had given notice that the value of the property would be fixed as of a date certain. Evidence directed to the value at that time had been laid before the triers of the facts in thousands of printed pages. To make the picture more complete, evidence had been given as to the value at cost of additions and retirements. Without warning or even the hint of warning that the case would be considered or determined upon any other basis than the evidence submitted, the Commission cut down the values for the years after the date certain upon the strength of information secretly collected and never yet disclosed. The company protested. It asked disclosure of the documents indicative of price trends, and an opportunity to examine them, to analyze them, to explain and to rebut them. The response was a curt refusal. Upon the strength of these unknown documents refunds have been ordered for sums mounting into millions, the Commission reporting its conclusion, but not the underlying proofs. The putative debtor does not know the proofs today. This is not the fair hearing essential to due process. It is condemnation without trial.

An attempt was made by the Commission and again by the state court to uphold this decision without evidence as an instance of judicial notice. Indeed, decisions of this court were cited (*Atchison, T. & S. F. Ry.*

*Co.* v. *United States,* 284 U. S. 248, 260; *Dayton Power & Light Co.* v. *Public Utilities Comm'n, supra,* p. 311; *Central Kentucky Natural Gas Co.* v. *Railroad Commission,* 290 U. S. 264, 274, 275) as giving support to the new doctrine that the values of land and labor and buildings and equipment, with all their yearly fluctuations, no longer call for evidence. Our opinions have been much misread if they have been thought to point that way. Courts take judicial notice of matters of common knowledge. 5 Wigmore, Evidence, §§ 2571, 2580, 2583; Thayer, Preliminary Treatise on Evidence, pp. 277, 302. They take judicial notice that there has been a depression, and that a decline of market values is one of its concomitants. *Atchison, T. & S. F. Ry. Co.* v. *United States, supra; Dayton Power & Light Co.* v. *Public Utilities Comm'n, supra; Central Kentucky Natural Gas Co.* v. *Railroad Commission, supra.* How great the decline has been for this industry or that, for one material or another, in this year or the next, can be known only to the experts, who may even differ among themselves. For illustration, a court takes judicial notice of the fact that Confederate money depreciated in value during the war between the states (*Wood* v. *Cooper,* 2 Heisk. (Tenn.) 441, 447; *Hix* v. *Hix,* 25 W. Va. 481, 484, 485), but not of the extent of the depreciation at a given time and place. *Modawell* v. *Holmes,* 40 Ala. 391, 405. Cf. *Feemster* v. *Ringo,* 5 T. B. Munroe (Ky.) 336, 337; *Baxter* v. *McDonnell,* 155 N. Y. 83, 93; 49 N. E. 667. The distinction is the more important in cases where as here the extent of the fluctuations is not collaterally involved but is the very point in issue. Moreover, notice, even when taken, has no other effect than to relieve one of the parties to a controversy of the burden of resorting to the usual forms of evidence. Wigmore, Evidence, § 2567; 1 Greenleaf, Evidence, 16th ed., p. 18. "It does not

mean that the opponent is prevented from disputing the matter by evidence if he believes it disputable." *Ibid.* Cf. *Shapleigh* v. *Mier,* 299 U. S. 468. Such at least is the general rule, to be adhered to in the absence of exceptional conditions. Here the contention would be futile that the precise amount of the decline in values was so determinate or notorious in each and every year between 1925 and 1933 as to be beyond the range of question. So much is indeed conceded on the face of the report itself. No rational concept of notoriety will include these variable elements. True, the category is not a closed one. "The precedents of former judges, in declining to notice or assenting to notice specific facts, do not restrict the present judge from noticing a new fact, provided only that the new fact *is* notorious to the community." 5 Wigmore, Evidence, § 2583. Even so, to press the doctrine of judicial notice to the extent attempted in this case and to do that retroactively after the case had been submitted, would be to turn the doctrine into a pretext for dispensing with a trial.

What was done by the Commission is subject, however, to an objection even deeper. Cf. *Brown* v. *New Jersey,* 175 U. S. 172, 174, 175; *West* v. *Louisiana,* 194 U. S. 258, 262, 263. There has been more than an expansion of the concept of notoriety beyond reasonable limits. From the standpoint of due process—the protection of the individual against arbitrary action—a deeper vice is this, that even now we do not know the particular or evidential facts of which the Commission took judicial notice and on which it rested its conclusion. Not only are the facts unknown; there is no way to find them out. When price lists or trade journals or even government reports are put in evidence upon a trial, the party against whom they are offered may see the evidence or hear it and parry its effect. Even if they are copied in the findings without

preliminary proof, there is at least an opportunity in connection with a judicial review of the decision to challenge the deductions made from them. The opportunity is excluded here. The Commission, withholding from the record the evidential facts that it has gathered here and there, contents itself with saying that in gathering them it went to journals and tax lists, as if a judge were to tell us, "I looked at the statistics in the Library of Congress, and they teach me thus and so." This will never do if hearings and appeals are to be more than empty forms.

We have pointed out elsewhere that under the statutes of Ohio no provision is made for a review of the order of the Commission by a separate or independent suit. *West Ohio Gas Co.* v. *Public Utilities Comm'n (No. 1)*, 294 U. S. 63, 68. A different question would be here if such a suit could be maintained with an intermediate suspension of the administrative ruling. *Porter* v. *Investors Syndicate*, 286 U. S. 461, 470, 471; *United States* v. *Illinois Central R. Co.*, 291 U. S. 457, 463; *Nickey* v. *Mississippi*, 292 U. S. 393, 396; *Wells, Fargo & Co.* v. *Nevada*, 248 U. S. 165, 168. Cf. *Norwegian Nitrogen Co.* v. *United States*, 288 U. S. 294, 318, 319. In Ohio the sole method of review is by petition in error to the Supreme Court of the State, which considers both the law and the facts upon the record made below, and not upon new evidence. In such circumstances judicial review would be no longer a reality if the practice followed in this case were to receive the stamp of regularity. To put the problem more concretely: how was it possible for the appellate court to review the law and the facts and intelligently decide that the findings of the Commission were supported by the evidence when the evidence that it approved was unknown and unknowable? In expressing that approval the court did not mean that, traveling beyond the record, it had consulted price lists for itself and had reached its

own conclusion as to the percentage of decline in value from 1925 onwards. It did not even mean that it had looked at the particular lists made use of by the Commission, for no one knows what they were in any precise or certain way. Nowhere in the opinion is there even the hint of such a search. What the Supreme Court of Ohio did was to take the word of the Commission as to the outcome of a secret investigation, and let it go at that. "A hearing is not judicial, at least in any adequate sense, unless the evidence can be known." *West Ohio Gas Co.* v. *Public Utilities Comm'n (No. 1), supra,* p. 69. Cf. *Interstate Commerce Comm'n* v. *Louisville & N. R. Co.,* 227 U. S. 88, 91; *United States* v. *Abilene & Southern Ry. Co.,* 265 U. S. 274, 288; *Chicago Junction Case,* 264 U. S. 258, 263, 264, 265.

Regulatory commissions have been invested with broad powers within the sphere of duty assigned to them by law. Even in quasi-judicial proceedings their informed and expert judgment exacts and receives a proper deference from courts when it has been reached with due submission to constitutional restraints. *West Ohio Gas Co.* v. *Public Utilities Comm'n (No. 1), supra,* p. 70; *West Ohio Gas Co.* v. *Public Utilities Comm'n (No. 2),* 294 U. S. 79; *Los Angeles Gas & Electric Corp.* v. *Railroad Commission,* 289 U. S. 287, 304. Indeed, much that they do within the realm of administrative discretion is exempt from supervision if those restraints have been obeyed. All the more insistent is the need, when power has been bestowed so freely, that the "inexorable safeguard" (*St. Joseph Stock Yards Co.* v. *United States,* 298 U. S. 38, 73) of a fair and open hearing be maintained in its integrity. *Morgan* v. *United States,* 298 U. S. 468, 480, 481; *Interstate Commerce Comm'n* v. *Louisville & N. R. Co., supra.* The right to such a hearing is one of "the rudiments of fair play" (*Chicago, M. & St. P. Ry. Co.* v. *Polt,* 232 U. S.

165, 168) assured to every litigant by the Fourteenth Amendment as a minimal requirement. *West Ohio Gas Co.* v. *Public Utilities Comm'n (No. 1), (No. 2), supra; Brinkerhoff-Faris Co.* v. *Hill,* 281 U. S. 673, 682. Cf. *Norwegian Nitrogen Co.* v. *United States, supra.* There can be no compromise on the footing of convenience or expediency, or because of a natural desire to be rid of harassing delay, when that minimal requirement has been neglected or ignored.

In an endeavor to sustain the judgment the State shifts its line of argument from the course pursued below, so far, at least, as the course then followed is reflected in the record. Both the Commission and the Supreme Court of Ohio tell us that they have applied the price trends to the value on the day certain by resort to judicial notice. The State now suggests that whatever the court or the Commission may have professed to be doing, there was a basis in the evidence for the conclusion ultimately reached. To give aid to that suggestion reference is made to the findings of a federal court as to the prices charged by Western Electric for telephone equipment, which findings were not in evidence, though they were founded upon evidence received by stipulation for purposes narrowly defined and exclusive of any others. The terms of the stipulation have already been stated in this opinion. Even if we assume in favor of the state that the evidence, when in, could be considered as indicative of the trend of market values generally, the judgment is not helped. The Commission did not take the prices paid by appellant to the affiliated corporation as the only evidence of market trends, but merely as one factor along with many others. What weighting it gave them the record does not disclose, and the Commission denied the appellant an opportunity to inquire. According to appellant's computation, telephone apparatus and equip-

ment make up less than 30% of the value of appellant's plant. Even for that portion of the plant, the Western Electric prices were not accepted as decisive, but were supplemented and corrected from sources *dehors* the record. For the other 70%, they were without probative significance, at all events until supplemented by evidence that the decline in the value of apparatus and equipment was less than that in the value of land or buildings or other components of the plant. To fix the value of these components the Commission had recourse to statistics which it collected for itself. "There was no suitable opportunity through evidence and argument . . . to challenge the result." *West Ohio Gas Co.* v. *Public Utilities Commission (No. 1), supra,* p. 90.

*Second:* The appellant has not estopped itself from objecting to the use of price trends gathered in its absence.

The company did not oppose the consolidation of the state-wide investigation with the Pence law proceedings. This did not amount, however, to a waiver of its right to have the value of its property determined upon evidence. At no stage of the inquiry was there any suggestion by the Commission that a different course would be pursued. We have no need to consider how the separate proceedings would have been affected by a valuation of the property in the general investigation if the evidence of value had been gathered in the usual way. In the thought of the state such a course would have obviated the necessity for separate evidence of value as to the exchanges under bond, but the company contended otherwise and made offers of proof in support of its contention. The merits of the opposing views in that regard may be put aside as irrelevant upon the record now before us. What is certain in any event is this, that nothing in the course of the trial gave warning

of the purpose of the Commission, while rejecting evidence of value in respect of exchanges under bond, to wander afield and fix the composite value of the system without reference to any evidence, upon proofs drawn from the clouds. As there was no warning of such a course, so also there was no consent to it. We do not presume acquiescence in the loss of fundamental rights.

*Third:* The allocation of excess income among the subscribers to exchanges and also among toll patrons is challenged by the appellant, the state retorting with the contention that there has been no denial of due process in the manner of partition, whatever may be said as to the possibility of inaccuracy or error.

We find it unnecessary at this time to choose between these two contentions. A court is not required to define the proper method of allocation until there has been a proper ascertainment of the thing to be allocated. When that has been done, there may be agreement or acquiescence in respect of the manner of division. Moreover, upon another hearing the problem may be eliminated if value, revenues and expenses are proved for each exchange.

*Fourth:* The same reasons that make it unnecessary to fix the method of allocation relieve us of the duty of passing upon other problems, such as those of going concern value and depreciation reserve, which cannot be disposed of adequately until the value of the physical plant has first been ascertained.

The decree is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

*Reversed.*