**In re BOWLING GREEN MILLING CO., Inc.**

**HATTER et al. v. UNITED STATES.**

**UNITED STATES v. HATTER et al.**

**Nos. 9167, 9168.**

Circuit Court of Appeals, Sixth Circuit.

Dec. 1, 1942.

G. S. Milam, of Russellville, Ky., and Robert D. Willock, of Bowling Green, Ky. (G. S. Milam, of Russellville, Ky., and R. D. Willock and Rodes & Willock, all of Bowling Green, Ky., on the brief), for E. P. Hatter and others.

Leavenworth Colby, of Washington, D. C. (Eli H. Brown, III, and Malcolm P. Wallace, both of Louisville, Ky., on the brief), for United States and others.

Before ALLEN, HAMILTON and McALLISTER, Circuit Judges.

ALLEN, Circuit Judge.

This case involves a controversy over the title to wheat deposited with a milling company, now bankrupt. The bankrupt, prior to adjudication, was engaged in a general milling business in Bowling Green, Kentucky, and also operated a number of warehouses for the storage of wheat, some of which were located in other towns. The wheat in question was delivered to the bankrupt by farmers mainly during the year 1940, and in small quantities during the three previous years, in exchange for which the farmers were in general given a so-called "white receipt," of which the following is typical:

"7-23-40

"Received of E. P. Hatter & Son, P. O. Franklin, Ky., 31379 Lbs. 59 Lb. test wheat

for six months free storage in our fireproof elevator, and we agree to pay market price at any day your wheat is offered for sale.

"Or, if left on deposit for exchange, —— Lbs. of —— flour per bushel.

"Due —— Lbs. —— flour.

"Bowling Green Milling Company,
" by H. Y. Copeland."

The wheat thus received was commingled according to grade.

Pursuant to the Agricultural Adjustment Act of 1938 which directed commodity loans to be made available to producers eligible thereunder (Title 7 U.S.C. § 1302(a) and (b), 7 U.S.C.A. § 1302(a, b), the Commodity Credit Corporation, an agency of the United States subject to the direction of the Secretary of Agriculture (Title 15 U.S.C. § 713 and note, 15 U.S.C.A. § 713 and note), entered into certain contracts with two banks in the vicinity which were designated as "lending agencies." Under the contracts the banks were to make loans to farmers on the security of assignments of warehouse receipts representing wheat owned by them. While the farmers were to have the right to redeem their wheat by payment of the loans, they were not to be personally liable for such payment and the Credit Corporation agreed to indemnify the banks against loss on the loans.

In contemplation of the loan arrangements with the banks the Secretary of Agriculture, acting on behalf of the Credit Corporation, also entered into a contract with the bankrupt under which the bankrupt agreed to accept grain for storage and issue warehouse receipts in a form approved by the Secretary. Under this contract, which was referred to as the Uniform Grain Storage Agreement, the bankrupt agreed to keep all eligible grain in store in a warehouse designated in the agreement and to maintain in the warehouse a stock of grain of the class, grade and quality described in the warehouse receipts sufficient to deliver the grain described by such receipts. The bankrupt also agreed to "load out or deliver to the holder of any warehouse receipt grain of the same class, grade, quantity and quality * * * as that described by the warehouse receipt."

Under the arrangement, when any farmer desired to secure a government loan he surrendered the white receipts heretofore described and received in lieu thereof negotiable "blue" receipts, which identified the grain by grade, weight and ownership precisely as it was identified in the white receipt and among other provisions included the following: "Said grain has been received with other grain of like grade and of about the same time of this receipt and is deliverable to the person from whom received, or order, upon the surrender of this receipt. * * *"

At the time of bankruptcy blue receipts representing some 26,319 bushels of wheat had been issued and assigned as security for the payment of loans which were duly advanced to the farmers by the banks. In addition to the blue receipts there were white receipts outstanding which represented some 85,000 bushels on which no loans were obtained. The bankrupt had on hand, according to its records, only 82,191 bushels, leaving a shortage of approximately 30,000 bushels. After bankruptcy the Credit Corporation, under its arrangement with the banks, purchased the notes at their face value from the banks and became the holder of the blue receipts.

A committee representing the holders of the white receipts filed a petition claiming that the deposit of the wheat with the bankrupt created a bailment and therefore sought an adjudication that the holders of the white receipts were the owners of wheat equal in amount and equivalent in quality to that called for by the white receipts. The Credit Corporation filed a petition in the name of the United States, seeking to reclaim an amount of the wheat sufficient to satisfy in full the blue receipts. The Credit Corporation claimed the holders of the white receipts had sold their wheat to the bankrupt, and hence were in the position of general creditors, while the holders of the blue receipts were bailors of the wheat represented thereby and entitled to possession of an equivalent amount of wheat. It also claimed that the bankrupt had violated its Uniform Storage agreement, giving rise to a claim for damages under which the Credit Corporation has priority because its claim arises out of a debt due to the United States. Title 31 U.S.C. § 191, 31 U.S.C.A. § 191; Title 11 U.S.C. § 104(a) (5), 11 U.S.C.A. § 104, sub. a(5).

A hearing was had before a referee, who concluded that the holders of the white receipts and the holders of the blue receipts stood on an equal footing as co-owners of the wheat in mass, and that the bankrupt had not acquired title thereto.

The District Court disagreed with the conclusions of the referee. It took judicial

notice of what it termed "a universal custom prevailing in agricultural communities in the marketing of all farm produce, without exception, in both the Western and Eastern Districts of Kentucky," that when a farmer delivers wheat to a milling company and accepts a warehouse receipt such as the white receipt, no bailment is intended and an immediate sale is consummated. It held that since blue receipts were obtained by surrender of white receipts, the holders of white receipts and the Credit Corporation were merely creditors standing on an equal footing in their claims against the bankrupt, and decided that since the Credit Corporation loaned no money to the farmers and was not a creditor of the bankrupt at the time of adjudication, under the holding in United States v. Marxen, 307 U.S. 200, 59 S.Ct. 811, 83 L.Ed. 1222, the Credit Corporation was not entitled to priority.

 As this record presents no proof tending to show that the holders of either white or blue receipts sold their wheat, and such a conclusion is supported only by the asserted trade usage upon which the District Court relied, the first important question is whether the court erred in taking judicial notice of the alleged custom. Both parties agreed in the original briefs filed on appeal and in the statements of points to be relied upon that the court had erred in taking judicial notice of this alleged custom. The Government, in its main brief on appeal, stated that it denies "that such a custom ever prevailed," but it has now changed its position on this question. We think, however, that the former agreement of counsel for all parties, acquainted with the customs of Kentucky, on this point of judicial notice is significant. A general custom need not be pleaded, and the court may take judicial notice of a custom which extends throughout the country and is recognized as part of the common law. We are unable to agree that there was sufficient uniformity or recognition of the alleged practice to which the District Court referred to entitle it to be raised to the dignity of a general custom. Considered as a local custom, its availability depended upon the existence of definite conditions which were not here shown to be present. The custom was not pleaded or relied upon in any way, nor, so far as this record shows, mentioned at the hearing. The first mention of it appears in the District Court's opinion. But a local custom or usage may not be taken advantage of unless pleaded.

Mowbray & Robinson Co. v. Kelley, 170 Ky. 271, 274, 185 S.W. 1130. Cf. Brumfield v. Consolidated Coach Corp., 240 Ky. 1, 18, 40 S.W.2d 356. A local custom must be well established, reasonable and generally known, of such age, uniformity of observance, certainty, fixedness of character and notoriety that a jury would be justified in saying that it was known to the party sought to be affected by it. Huston v. Peters, Hardin & Co., 1 Metc. 558, 58 Ky. 558. Under Kentucky law there is a strong disinclination in the courts "to allow the general laws of the country to be varied by proof of local usages. Such an usage is binding only on the ground that the party, sought to be charged, contracted with reference to it. Hence it must appear that he had actual knowledge of it, or the evidence must be such as to clearly authorize the presumption that he had knowledge of it. * * *" Caldwell, Hunter & Co. v. Dawson, 4 Metc. 121, 61 Ky. 121. No knowledge whatever of such a usage is indicated upon the part of the farmers delivering this wheat. It is not sufficient that an act is frequently done, for a loose, variable custom or discretionary practice will not be permitted to control the rights of the parties to a contract. Aulich v. Craigmyle, 248 Ky. 676, 681, 59 S.W.2d 560.

 In addition, under Kentucky law evidence of a custom or usage of trade is admissible only as a means of arriving at the intention of the parties, never to thwart or control it. Kendall v. Russell, 5 Dana 501, 35 Ky. 501, 30 Am.Dec. 696; Lillard v. Kentucky Distilleries & Warehouse Co., 6 Cir., 134 F. 168. In the instant case the blue receipts contained express statements showing that the deposit of wheat was intended as a bailment. The white receipt, while less explicit, also states plainly that there is to be a sale "at any day your wheat is offered for sale" and therefore recognizes that there will be no sale until the farmer makes an offer of his wheat. To hold that a usage exists under which an immediate sale is made of the wheat upon delivery of such a receipt, therefore, is to make use of usage to thwart and control the express intention of the parties.

 Usage or custom cannot be availed of to dispense with evidence unless the fact shown thereby is certain and indisputable. "Notice, even when taken, has no other effect than to relieve one of the parties to a controversy of the burden of

resorting to the usual forms of evidence. * * * 'It does not mean that the opponent is prevented from disputing the matter by evidence if he believes it disputable.'" Ohio Bell Telephone Co. v. Public Utilities Commission of Ohio, 301 U.S. 292, 301, 57 S.Ct. 724, 729, 81 L.Ed. 1093. Here, as there, the matter is important because in the instant case the question whether the white receipt transactions were sales or bailments was the "very point in issue." This is another way of stating the rule that usage, to be availed of, must be well established, uniform, certain, fixed in character, and commonly known. Huston v. Peters, Hardin & Co., supra. We cannot consider, in a controversy where both parties agree that no such custom existed, and both parties assign the ruling on this point as error, that there is no doubt concerning its existence. We recognize the superior opportunity for knowledge possessed by the District Court as to the existence of local customs or usages in Kentucky, but to approve the application of the doctrine of judicial notice on the facts of the present case "would be to turn the doctrine into a pretext for dispensing with a trial." Ohio Bell Telephone Co. v. Public Utilities Commission of Ohio, supra, at page 302 of 301 U.S., at page 729 of 57 S.Ct., 81 L.Ed. 1093. In fact the ruling would seem by application of the doctrine of judicial notice, where the alleged custom was not pleaded, to raise a controversy not presented by the record; but this, as held by the Supreme Court of the United States, cannot be done. Mountain View Mining & Milling Co. v. McFadden, 180 U.S. 533, 21 S.Ct. 488, 45 L.Ed. 656; Arkansas v. Kansas & Texas Coal Co., 183 U.S. 185, 190, 22 S.Ct. 47, 46 L.Ed. 144; Mutual Life Ins. Co. v. McGrew, 188 U.S. 291, 312, 23 S.Ct. 375, 47 L.Ed. 480, 63 L.R.A. 33.

Since the District Court erred in taking judicial notice of the alleged custom, we treat the assumption that such a custom existed as entirely unsupported and consider the nature of the transaction as based upon the wording of the white receipt, the blue receipt, and the testimony. No substantial evidence was introduced to show that the transaction between the bankrupt and the holders of white receipts constituted a sale. The wheat was delivered, but no money passed at the time of delivery and no agreement was made by the bankrupt to pay any specific amount at any time in the future. While the white receipt is very brief and does not cover all possible elements of such a transaction, it is complete and unambiguous in the terms which are stated. It is denominated a receipt, and the only contract which it evidences is that six months free storage shall be given in the elevator for the wheat delivered and that market price will be paid on any day when the "wheat is offered for sale." The provision for storage for such an extended period smacks not of sale, but of bailment. The agreement to pay the market price when the wheat is offered for sale contemplates a future transaction which may culminate in a sale, but does not effect a passage of title before such offer to sell is made.

The conclusion that holders of the blue receipts parted with title to the wheat is plainly erroneous, for these receipts were issued in strict compliance with the Kentucky statute (Carroll's Kentucky Statutes, § 4786), and the blue receipt transaction clearly was a bailment.

The fact that numerous holders of the white receipts gave up these receipts for blue receipts which covered exactly the same deposit of wheat does not tend to establish that there was a sale at the time that the white receipts were delivered for if the wheat was sold and if a loan was obtained with that wheat as security, the loan should have been obtained by the bankrupt as owner, instead of by the farmers. In fact the entire underlying theory of these government loans, upon which the system of contracts was based, was that the farmers retained title to the wheat after delivery to the warehouseman.

We conclude that the transaction covered by the white receipt is a bailment and that the bankrupt rested under an implied obligation to redeliver wheat of the quality and quantity described therein to the holder of the receipt. We do not decide that the only possible disposition of this case requires the wheat to be distributed in kind, for we think the bankruptcy court has ample authority to order a sale and distribution of the proceeds if it deems such procedure the most fair and equitable. Inasmuch as all holders are bailors, the entire mass of the wheat is owned in common, title never passed to the bankrupt, and the wheat or its proceeds is to be distributed to the claimants, including the Credit Corporation, on a pro rata basis. The Credit Corporation is on the same footing as the holders of white receipts. Its rights rise no higher than those

of the original holders of blue receipts. Citizens' National Bank v. W. H. Simmons & Co., 210 Ky. 683, 276 S.W. 494.

We agree with the District Court that the Credit Corporation is not entitled to priority under § 191, Title 31 U.S.C., 31 U.S.C.A. § 191, as an agency of the United States. It took over the notes and warehouse receipts and reimbursed the banks for money loaned the farmers subsequent to the instant bankruptcy. Prior thereto it had no claim against the bankrupt. The contract to redeliver wheat was made for the benefit of the holder of the receipt and could be enforced only by such holder. Prior to bankruptcy the Credit Corporation did not hold the receipt, and after making the loans, and before bankruptcy, only the banks, the then holders of the receipts, had a claim for violation of the agreement. Nor is the claim of priority strengthened by the fact that it is now asserted in the name of the United States. The rights of the creditors are fixed as of the time of the filing of the petition in bankruptcy. United States v. Marxen, supra; In re Miller, 2 Cir., 105 F.2d 926.

As the District Court erred in its conclusion that the transactions constituted sales and not bailments and as its conclusion upon that point controls the nature and extent of the relief to be afforded the various claimants, the judgment is reversed and the case is remanded for further proceedings consistent with this opinion.