# OLD DOMINION ELECTRIC COOPERATIVE

## V.

# VIRGINIA ELECTRIC AND POWER COMPANY, ET AL.

Record No. 880808

March 3, 1989

Present: Carrico, C.J., Compton, Stephenson, Russell, Thomas, Whiting, JJ.,
and Harrison, Retired Justice

*Michael L. Hern (Nathan H. Miller; Litten, Sipe & Miller,* on brief), for appellant.

*Evans B. Brasfield; Wayne N. Smith (Charles H. Carrathers, III; John E. Cunningham; Lewis S. Minter; Stewart E. Farrar; Hunton & Williams,* on briefs), for appellees.

THOMAS, J., delivered the opinion of the Court.

In this appeal of right from the State Corporation Commission (the Commission), Old Dominion Electric Cooperative (ODEC) contends that the Commission erred when it refused to reopen the record in a general rate case involving Virginia Electric and Power Company (Virginia Power) to consider evidence that events which occurred at Virginia Power shortly after the record closed

in the rate case raised serious questions about the accuracy of evidence adduced by Virginia Power during the rate case. Virginia Power and the Commission both contend that ODEC has no standing to appeal the rate case. Further, they contend that if ODEC does have standing to pursue this appeal, its claims are without merit.

## FACTS

On March 6, 1987, the Commission initiated an investigation into the financial condition of Virginia Power, Case No. PUE870014. On September 14, 1987, the Commission ordered that Virginia Power's then existing jurisdictional rates be considered subject to refund, with interest, from that date until the completion of the investigation. A public hearing on the investigation commenced on that same day.

ODEC, a multistate supplier of electric power to cooperatives, had an agreement to purchase power at wholesale from Virginia Power. However, on July 27, 1987, ODEC reached an agreement with members of the Allegheny Power System (APS) to purchase 300 megawatts (MW) of power at a price substantially below that being charged by Virginia Power. ODEC petitioned the Commission, Case No. PUE870053, to find that it was in the public interest for ODEC to return 300 MW of capacity to Virginia Power by making the alternate purchase from APS.

The cost of electric power is based on two components, an energy component and a capacity component. The energy component, in essence, is the cost of the fuel used to generate electricity. The capacity component is the cost of the buildings and facilities that stand ready to produce the power. The fuel savings from the return of 300 MW of capacity would pass automatically to the remaining Virginia Power customers by operation of the fuel adjustment factor. However, no automatic mechanism exists to adjust the capacity costs. If the return of 300 MW of capacity left Virginia Power with excess capacity, then the question of who should pay for the idle plant which stood ready to generate the power had to be resolved. The resolution of this issue required consideration in a base rate proceeding.

Virginia Power concluded that it would face a shortfall in revenues in the first year of the return of capacity. ODEC and Virginia Power entered into negotiations to resolve that problem.

They reached a preliminary agreement on September 11, 1987, three days before the scheduled public hearing in Virginia Power's general rate case. Part of that preliminary agreement was that ODEC and Virginia Power would jointly petition the Commission to reallocate to Virginia jurisdictional customers the cost of service associated with the 300 MW return of capacity and that the Commission would be requested to consider the reallocation issue in the general rate case. On that same day, Virginia Power, by motion, requested the Commission to address, in the general rate case, "the issues associated with the reallocation of 300 MW of capacity currently allocated to" ODEC. Thereafter, on October 7, 1987, ODEC requested leave to participate in the general rate case as a protestant "for the single purpose of addressing the ratemaking issues" connected with the reallocation of the 300 MW. ODEC stated in its protest that if it were granted leave to participate, it reserved "its right to cross-examine witnesses, make arguments, present evidence, and to file briefs with respect to the ratemaking issues presented by the loss of sales by Virginia Power to" ODEC.

In a ruling issued on October 14, 1987, the Hearing Examiner in the general rate case granted ODEC's motion. The examiner ruled that "ODEC should be authorized to participate as a party in this proceeding." But, that participation was limited to "addressing issues related to the potential settlement between ODEC and Virginia Power currently pending in Case No. PUE870053." The Hearing Examiner noted that no one objected to ODEC's participation "in this proceeding on this one issue."

On October 16, 1987, ODEC and Virginia Power reached a final settlement agreement concerning the return of the 300 MW. The parties agreed that if the return was implemented in accordance with that agreement, it would result in benefits to their customers. The parties also agreed that:

[O]n the Effective Date and monthly thereafter through December 1988, Old Dominion will pay Virginia Power $1,721,000 to be passed through to Virginia Power's Virginia [j]urisdictional customers to offset their 1988 net increase in rates resulting from the reallocation of the 300 MW of capacity . . . . The payments will be adjusted if appropriate . . . pursuant to Paragraph 5.3.

Paragraph 5.3 was part of Article V of the settlement which concerned reallocation. The parties agreed in that article that the reallocation of the 300 MW would "result in an additional revenue requirement of approximately $29,000,000 in 1988," subject to adjustment. Paragraph 5.3 then stated, in pertinent part, that

if the Commission determines that a full reallocation will result in an additional revenue requirement of other than $29,000,000, then the payments [of $1,721,000] shall be adjusted to reflect the Commission-approved revenue requirement, other than $29,000,000, if, in principle, it contains the full reallocation.

Article V also reiterated that ODEC would not become a party to the general rate case "except for the purpose of supporting this Settlement Agreement these principles and the benefits provided to [ODEC] by this Settlement Agreement."

There was some urgency to a Commission decision with regard to the reallocation issue because ODEC's arrangement with APS provided that if satisfactory regulatory and governmental approval had not been secured by November 30, 1987, either ODEC or APS could unilaterally terminate their agreement. Because of this, on October 28, 1987, ODEC moved that the Hearing Examiner certify the reallocation question to the Commission immediately after the October 29, 1987 hearing scheduled to consider that issue.

On October 29, 1987, the hearing concerning reallocation was held as scheduled. At that hearing, witnesses testified on behalf of Virginia Power, ODEC, the Commission staff, and the Virginia Committee for Fair Utility Rates. Every witness testified that both Virginia Power consumers and ODEC consumers would benefit from the return of capacity. The evidence showed that the present value of the long term benefit of the arrangement to Virginia Power was approximately $43 million while the value to ODEC, before any payments to Virginia Power, was $88 million.

One area of inquiry at the hearing was whether, and to what extent, Virginia Power would face an increased revenue requirement in 1988 because of the return of capacity. All witnesses agreed that Virginia Power would face a revenue shortfall in the first year of ODEC's seven-year arrangement with APS. Virginia Power, using projections of 1988 capacity needs, calculated that

its additional revenue requirement would be $30.8 million. The Commission staff agreed with this calculation.

The record in the general rate case closed on October 29, 1987. Although ODEC became a party on October 15 and although, prior to October 29, it had the benefit of Virginia Power's calculations of the effects of the return of capacity, ODEC did not pursue discovery from Virginia Power on that issue. Further, at the October 29 hearing, it did not cross-examine Virginia Power's witnesses on that issue; nor did it offer any countervailing evidence. Indeed, at the October 29 hearing ODEC fully supported Virginia Power's calculations.

By order dated November 10, 1987, the Hearing Examiner certified the reallocation issue to the Commission. On November 25, 1987, the Commission issued an Interim Order in which it concluded that "ODEC's purchase of capacity from APS and the subsequent reallocation of costs by Virginia Power will result in net savings to Virginia Power customers and ODEC." The Commission approved the reallocation of expenses associated with the 300 MW return of capacity but reserved "the specific levels of reallocation" for the final order. The reservation was necessary because the Commission determined that the "exact amount of the projected savings and reallocation levels [could not] be quantified until other issues" were decided in the final order.

Three months after the close of the general rate case, ODEC received a letter dated January 28, 1988, from Virginia Power setting forth Virginia Power's system reserve margin (SRM) for 1988. The SRM was calculated based on the return of capacity from ODEC. Yet, it also showed a yearlong purchase of 200 MW from APS; a purchase of another 250 MW in June, July, and August of 1988 from another supplier; and a purchase of yet another 200 MW in June, July, August, and September 1988 from a third supplier.

The January 28 letter was of great significance to ODEC because Virginia Power's calculations of its revenue requirements in the general rate case had been based on the 300 MW return of capacity being excess for all of 1988 except for the summer months when the 300 MW return was calculated to reduce the need for the summer purchase of power. From ODEC's standpoint, if Virginia Power had agreed to purchase 200 MW of power yearlong "on top of" having the return of 300 MW from ODEC, Virginia Power must have actually needed 500 MW for

all of 1988, thus the return of 300 MW was not the return of excess capacity; it was the return of badly needed capacity.

On February 5, 1988, ODEC filed a motion requesting the Commission to require Virginia Power to update the calculations of the savings resulting from the ODEC 300 MW return of capacity. In that motion, ODEC stated that:

> [t]he rate year capacity cost savings calculated by Virginia Power were based on a 356 MW reduction in a short-term 500 MW purchase planned for the summer of 1988. This reduction was intended to reflect the 300 MW load reduction by ODEC and an 18.5 percent reserve requirement. For the remaining nine months of 1988, Virginia Power expected to have surplus capacity of 300 MW.

ODEC alleged further that the 200 MW yearlong purchase from APS

> indicates that the ODEC 300 MW load reduction will enable Virginia Power to avoid higher capacity costs for the entire 1988 calendar year rather than the three summer months as reflected by the utility's testimony in this proceeding. But for the ODEC load reduction, Virginia Power's purchase from APS would necessarily have been for about 500 MW in order for . . . it to acquire the generation capability which it has found to be desirable. Recalculation of Virginia Power's revenue requirement resulting from the ODEC load reduction using *current* power purchase information will result in the elimination of any base rate increase, as well as the need for a substantial portion of the payments by ODEC to Virginia Power.

(Emphasis added.) ODEC stated further in its motion that without *"current data"* the Commission could not properly determine the specific levels of reallocation, an issue the Commission had reserved for determination in its final order. In addition, ODEC stated that without the use of current data, Virginia Power stockholders would be unjustly enriched at the expense of both Virginia Power rate payers and ODEC.

The Hearing Examiner denied the motion. The Commission upheld the Hearing Examiner's decision. On April 7, 1988, in its final order, the Commission wrote as follows:

The Examiner, in a well-reasoned ruling, concluded that ODEC's motion to update the calculation of anticipated savings resulting from the ODEC 300 MW load reduction, together with ODEC's motion to file interrogatories relevant to the foregoing, should both be denied. We agree with the Examiner's recommendation and it is adopted.

ODEC's obligations under its October 16 agreement with [Virginia Power] were negotiated at arm's length. ODEC fully supported the agreement at the hearing.

Of equal significance is the right of the public and the parties to have this case concluded and decided. To reopen the record would delay resolution and would, no doubt, necessitate updating all capacity charges to a current level. Rate cases have to end, and we will not open this record to accommodate events and arguments arising after all parties have had a fair opportunity to address the issues.

On April 15, 1988, ODEC filed a petition for reconsideration. In that petition, ODEC states that the January 28 letter "proves conclusively that the capacity purchase *projections* presented by the utility at the hearing were not an accurate *prediction* of its 1988 capacity purchases. Thus, the evidence upon which the Commission is basing its reallocation of expenses and calculation of capacity cost savings resulting from the load reduction is incorrect." (Emphasis added.) ODEC also asserted that "Virginia Power knew or should have known at the time of the hearing that its evidence concerning the load reduction was not accurate." ODEC contended that to reopen its part of the case would not require reopening the entire case.

ODEC filed the affidavit of Ernest M. Jordan, Jr., along with its petition for reconsideration. There, Jordan, President of ODEC averred that,

On numerous occasions during the lengthy negotiations which resulted in the Settlement Agreement, I and other ODEC employees advised Virginia Power negotiators that we believed that Virginia Power's load growth and capacity purchase projections for 1988 were understated based on historical trends and the actual versus projected loads year-to-date 1987. We asked that the projections and the level of

payments to be made by ODEC to Virginia Power be revised to reflect historical trends.

He also claimed the right to rely on the representations of the Virginia Power negotiators because they were in total control of the flow of information concerning the issue.

## STANDING

Virginia Power and the Commission have filed separate motions to dismiss on the ground that ODEC is not a "party in interest" nor a "party aggrieved." They submit that because ODEC purchases power at wholesale, it is not subject to regulation by the Commission. Thus, they argue, ODEC has no inherent interest in a general rate case involving Virginia Power. They point out that ODEC's involvement is based on a contract which it voluntarily entered with Virginia Power. Moreover, they submit that in that contract ODEC agreed to be bound by a Commission determination of Virginia Power's revenue requirement, which is simply a component in the Commission's determination of Virginia Power's overall cost of service. Thus, they argue, the Commission decision in the general rate case has only incidental impact upon ODEC and, therefore, ODEC has no right or power to complain. We disagree.

The Commission permitted ODEC to become a party to the general rate case with regard to all issues related to the reallocation of costs resulting from the return of capacity from ODEC. The calculation of the revenue requirement resulting from that return of capacity is certainly an issue relating to the reallocation question. ODEC then was given permission by the Commission to help insure that the determination of the revenue requirement was correctly made. Moreover, ODEC was affected in its pocketbook by the determination of the revenue requirement. Based on the decision with regard to that matter, the payments to which ODEC had agreed in the settlement agreement were increased from approximately $1.7 million to approximately $1.8 million. ODEC contends that had the issue been correctly decided its payments may have been reduced to near zero.

Article IX, § 4 of the Constitution of Virginia provides that "[t]he Commonwealth, any party in interest, or any party aggrieved by any final finding, order, or judgment of the Commission shall have, of right, an appeal to the Supreme Court." *See*

*also* Code § 12.1-39. We set forth in *Harbor Cruises* v. *Corporation Comm.*, 219 Va. 675, 250 S.E.2d 347 (1979), the test for standing to appeal a Commission decision. We wrote as follows:

[A]n appealing party . . . must show an immediate, pecuniary, and substantial interest in the litigation, and not a remote or indirect interest. He must also show that he has been aggrieved by the judgment or decree appealed from. He does not have standing to assert purely abstract questions . . . but has standing only to seek the correction of errors injuriously affecting him.

*Id.* at 676, 250 S.E.2d at 348. In our opinion, ODEC meets the requirements for standing set forth in *Harbor Cruises*.

Virginia Power cites *Young* v. *Corporation Commission*, 205 Va. 111, 135 S.E.2d 129 (1964) and *Insurance Association* v. *Commonwealth*, 201 Va. 249, 110 S.E.2d 223 (1959) in support of its contention that ODEC has no standing to bring this appeal. Those cases are distinguishable. *Young* was held to have no right to appeal because "[h]e was not a party to the proceeding, did not ask that he be made a party, or assert any interest therein . . . . Indeed, so far as the record shows, he was not present at or took any part in the proceeding." 205 Va. at 113, 135 S.E.2d at 130. In *Insurance Association*, the entity which sought the appeal was a nonstock nonprofit organization whose membership consisted of insurance agents who issued automobile insurance and property and casualty insurance. The association sought to complain of a decision in an insurance rate case which affected the commission which could be charged by insurance agents. We held that the association had no standing to appeal because it had not been a party, the order did not directly affect the association, and there was no contractual relationship between the association and its member agents. Here, ODEC was a party, was directly affected, and has a contractual relationship with Virginia Power. Accordingly, we hold that ODEC had standing to pursue this appeal. The motion to dismiss is denied.

## REOPENING THE RECORD

### Abuse of Discretion

ODEC argues that the Commission abused its discretion in refusing to reopen the record. It contends that the evidence in the

record concerning "reallocation of costs is clearly incorrect." ODEC asserts, on brief, that "Virginia Power's January 28, 1988 letter shows that, *sometime after the hearing*, Virginia Power contracted to purchase 200 MW of capacity from APS for all twelve months of 1988, the new purchase beginning simultaneously with the load reduction." (Emphasis added.)

According to ODEC, in refusing to reopen the record the Commission showed "a predisposition in favor of Virginia Power and against cooperative ratepayers." ODEC reaches this conclusion because part of the Commission's rationale was that to reopen the record might result in increased Virginia Power rates. ODEC also complains that the Commission has given undue consideration to questions of expediency when it refused to reopen the record because to do so would cause delay. ODEC argues that considerations of expediency can never be allowed to violate the rudiments of fair play required by the constitutional guarantees of due process and equal protection.

In support of its abuse of discretion argument, ODEC relies on *Ohio Bell Telephone Co.* v. *Public Utilities Commission*, 301 U.S. 292 (1937) and *West Ohio Gas Co.* v. *Public Utilities Commission*, 294 U.S. 79 (1935). Both cases are inapposite. In *Ohio Bell*, the Supreme Court held that the fundamentals of a fair trial were denied the utility because the utilities commission took judicial notice of matters outside the record in valuing the utility's property. In *West Ohio Gas*, the Supreme Court held that the utilities commission improperly ignored survey results that were in the record and predicated new rates upon projections that were also in the record. The vice of the commission's decision was preferring a forecast to actual facts. In this case, the record closed on October 29, 1987, and the Commission proceeded thereafter, based on the evidence in the record, to decide the case.

ODEC also relies upon Code § 56-235.3 which provides in pertinent part that "[t]he Commission shall be authorized to prescribe all necessary rules and regulations for the conduct of . . . hearings which shall provide for *full and fair participation . . .* by any interested person subject to such guidelines as the Commission may deem appropriate." (Emphasis added.) ODEC argues that unless the record is reopened it will be denied a full and fair hearing in violation of the statute. As discussed below, ODEC, in our view, had a full and fair opportunity to participate, but simply failed to take advantage of that opportunity.

■ The Commission gave two reasons for its refusal to reopen the record: (1) the settlement was the result of arm's length bargaining and it was fully supported at the hearing by ODEC; (2) reopening the case would result in delay and would require updating all capacity changes to a current level. In our opinion, these are proper bases upon which to refuse to reopen a case of this kind.

With regard to the arm's length nature of this transaction, ODEC has very little comment. But the point is this: ODEC negotiated an agreement based on projections. It was content to allow its payments to be determined on the basis of decisions based upon projections. It was not required to enter such an arrangement. Virginia Power's counsel asserted during oral argument that ODEC could have bargained to use actual capacity cost figures as the basis for the payments to Virginia Power. Such a provision was referred to as a "true up mechanism" and was said to describe a situation in which payments were made on projected figures then adjusted based on actual figures. ODEC's counsel did not refute this representation. Thus, the Commission properly considered the fact that ODEC did not bargain for the use of actual figures.

■ The Commission also properly considered the fact that ODEC *fully* supported Virginia Power's figures at the hearing. ODEC attempts to explain this away by saying that Virginia Power had superior knowledge on this score. But ODEC overlooks the significance of its president's affidavit submitted with the petition for reconsideration of the motion to reopen the record. There, the affiant stated that throughout the negotiations ODEC was concerned that "Virginia Power's load growth and capacity purchase projections for 1988 were understated based on historical trends and the actual versus projected loads year-to-date 1987."

Despite this concern, ODEC did not use the discovery tools available to it to delve into Virginia Power's records relating to this issue. Nor did ODEC even cross-examine Virginia Power witnesses to challenge their basic assumptions about load growth and capacity purchases. Indeed, ODEC did not even call its own witness to give a different projection on these issues. It is obvious from the record that despite its own suspicions, ODEC rushed forward, fully supporting Virginia Power's evidence so that it could consummate its arrangement with APS prior to the November 30 unilateral termination date.

■ The Commission was also correct in asserting that the record had to close at some time. This was a complex general rate case. There were at least eleven participants. The case opened on March 6, 1987. The Hearing Examiner identified 30 distinct issues. The Final Order is 37 pages long and addresses a myriad of issues in addition to the one of concern to ODEC. Virginia Power asserted on brief and in oral argument that to reopen the case to adjust one factor might require adjustment of many others. ODEC counsel was asked whether the case could be reopened with respect to this one issue. He replied, "the simple answer is no."

There is no allegation that Virginia Power had begun to negotiate with APS for the yearlong purchase of 200 MW before the record closed in this case. Indeed, ODEC alleges that "sometime after" the October 29 hearing Virginia Power contracted to purchase the power. The gravamen of ODEC's position is that current data is more accurate than the projections relied on at the hearing. This is certainly so but it is beside the point. There was no arrangement between ODEC and Virginia Power to use actual data and there is no general requirement that the Commission must reopen a general rate case to use actual figures.

At best, a general rate case gives the Commission a view of the operations of a utility at a moment in time. The next moment events may have changed considerably. We agree with the Commission that it would cause delay and confusion to reopen a complex record of this kind to substitute actual figures for projected figures. Therefore, we hold that the Commission did not abuse its discretion in refusing to reopen the record.

### Violation of Commission Rule 8:2(d)
### With Regard to After-Discovered Evidence

■ ODEC next argues that pursuant to Commission Rule 8:2(d), the Commission was required, in this case, to abide by "the rule of after-discovered evidence." Then ODEC argues that had the rules of after-acquired evidence been adhered to the Commission would have reopened the case because the January 28, 1988 letter obviously did not exist in October 1987. We do not agree.

Commission Rule 8:2(d) provides as follows:

> In all proceedings in which the Commission shall be called upon *to decide or render judgment only in its capacity as a court of record*, the common law and statutory rules of evidence shall be as observed and administered by the courts of record of this State. In all other proceedings, *due regard shall be given to the technical and highly complicated subject matter the Commission must consider*, and exclusionary rules of evidence shall not be used to prevent the receipt of evidence having substantial probative effect. Otherwise, effect shall be given to the rules of evidence recognized by the courts of record of this State.

(Emphasis added.) This is a "technical and highly complicated" case in which the Commission is given discretion regarding the application of general rules of evidence. Under these circumstances, we hold that the Commission did not abuse its discretion in refusing to consider so-called "after-discovered evidence."

### The Decision Not to Reopen
### Resulted in Discriminatory Rates

■ ODEC also argues that unless the case is reopened, Code § 56-235 will be violated because ODEC will be required to make *excess* payments to Virginia Power in the amount of $20 million. ODEC asserts that such payments will mean that cooperative consumers will be required to subsidize Virginia Power consumers. ODEC contends that in light of the statute such payments would be "unjustly discriminatory" and "preferential." We disagree.

The Code provision in question reads as follows:

> If upon investigation the rates, tolls, charges, schedules, or joint rates of any public utility operating in this State shall be found to be unjust, unreasonable, insufficient or unjustly discriminatory or to be preferential or otherwise in violation of any of the provisions of law, the State Corporation Commission shall have power to fix and order substituted therefor such rate or rates, tolls, charges or schedules as shall be just and reasonable. All rates, tolls, charges or schedules set by the Commission shall be valid only if they are in full conformance with the provisions of this chapter.

Code § 56-235. ODEC's argument, with regard to this provision, has merit only if it was improper for the Commission to close the record on October 29, 1987, and keep it closed. However, as we have demonstrated, that decision was proper. The charges are not unjust or unreasonable based on the record as it existed at the time the Commission decided the case. Therefore, we hold that there was no violation of Code § 56-235 on the facts of this case.

## CONCLUSION

For all the foregoing reasons, the order of the Commission will be

*Affirmed.*