AMERICAN EMPLOYERS' INSURANCE COMPANY & others *vs.* COMMISSIONER OF INSURANCE.

SAME *vs.* SAME.

Suffolk. April 12, 1937. — September 16, 1937.

Present: RUGG, C.J., FIELD, LUMMUS, & QUA, JJ.

*Commissioner of Insurance. Insurance,* Motor vehicle liability. *Equity Jurisdiction,* Review of decision of insurance commissioner. *Words,* "Due hearing and investigation."

The commissioner of insurance, before determining the classification of risks and premium charges for compulsory motor vehicle liability insurance, was required by G. L. (Ter. Ed.) c. 175, § 113B, as amended by St. 1935, c. 459, § 4, to hold a full hearing observing fundamental procedural requirements, and to act only upon evidence then introduced; and a determination based in part upon his consideration of data gathered by his examiners and in his file but not put in evidence at such hearing must be annulled.

Upon a petition under G. L. (Ter. Ed.) c. 175, § 113B, as amended by St. 1935, c. 459, § 4, for a review of an order of the commissioner of insurance determining the classification of risks and premium charges for compulsory motor vehicle liability insurance, the court has no jurisdiction, after having annulled the order, to adjudge and establish rates.

BILL IN EQUITY, and PETITION FOR REVIEW, filed in the Supreme Judicial Court for the county of Suffolk on October 10, 1936.

The cases were reserved and reported by *Donahue*, J.

*F. H. Chase*, (*R. P. Baldwin* with him,) for the petitioners.

*E. O. Proctor*, Assistant Attorney General, for the respondent.

RUGG, C.J.   These cases have been reserved for our consideration upon the pleadings, the master's reports and the exceptions thereto, the motion of the respondent for recommittal, and the decree denying that motion.   The proceedings are brought by certain stock companies authorized to issue motor vehicle liability insurance policies or bonds.   The cases arise out of an order of the respondent as commissioner of insurance made on September 21, 1936, fixing classifications of risks and insurance premium charges for motor vehicle liability policies and bonds as defined in G. L. (Ter. Ed.) c. 90, § 34A.   The first case is a suit in equity alleging that the order is void for reasons therein stated.   The other is a petition in equity brought under the provisions of G. L. (Ter. Ed.) c. 175, § 113B, as amended by St. 1935, c. 459, § 4, whereby review of that order and other relief are sought.   That section, as in force when the respondent made the order in question and also a similar order in September, 1935, provided in the first paragraph thereof as follows: "The commissioner shall, annually on or before September fifteenth, after due hearing and investigation, fix and establish fair and reasonable classifications of risks and adequate, just, reasonable and non-discriminatory premium charges to be used and charged by companies in connection with the issue or execution of motor vehicle liability policies or bonds, both as defined in section thirty-four A of chapter ninety, for the ensuing calendar year or any part thereof.   He shall, on or before said date, sign memoranda of the classifications and premium charges fixed and established by him in such form as he may prescribe and file the same in his office, and cause a duly certified copy of such classifications and schedule of premium charges forthwith to be transmitted to each company authorized

to issue such policies or to execute such bonds. During said calendar year, the classifications and premium charges fixed and established by the commissioner for such policies shall be used by all companies issuing such policies, and the classifications and premium charges for such bonds shall be used by all companies acting as surety on such bonds." The section provided that the charges should be fixed after a hearing of which notice incorporating a schedule precisely setting forth the premium charges proposed to be established for the ensuing calendar year had been given in a manner specified. The section further provided: "The commissioner may make, and, at any time, alter or amend, reasonable rules and regulations to facilitate the operation of this section and enforce the application of the classifications and premium charges fixed and established by him, and to govern hearings and investigations under this section. He may at any time require any company to file with him such data, statistics, schedules or information as he may deem proper or necessary to enable him to fix and establish or secure and maintain fair and reasonable classifications of risks and adequate, just, reasonable and non-discriminatory premium charges for such policies or bonds. . . . Any person or company aggrieved by any action, order, finding or decision of the commissioner under this section may, within twenty days from the filing of such memorandum thereof in his office, file a petition in the supreme judicial court for the county of Suffolk for a review of such action, order, finding or decision. . . . The court shall have jurisdiction in equity to modify, amend, annul, reverse or affirm such action, order, finding or decision, shall review all questions of fact and of law involved therein and may make any appropriate order or decree. The decision of the court shall be final and conclusive on the parties."

The cases were referred to a master, who has filed a principal and comprehensive report in the petition for review, and has considered in the report in the suit in equity only the narrower issues there involved.

When the compulsory motor vehicle insurance law (hereafter called the compulsory insurance law) was first enacted

in 1925, the commissioner of insurance, then in office considered various possible methods for determining premium charges. There was formed with his approval a voluntary association of the interested insurance corporations, termed for convenience the bureau. Its declared objects were to coöperate with the commissioner in carrying out the provisions of the compulsory insurance law and to deal with the various activities arising under it. It was not formed by the commissioner in the exercise of any specific statutory power. It was, however, formed at his request and was adopted by him as his principal instrumentality for collecting data and statistics for use in establishing classifications of risks and fixing premium charges as required by said § 113B. Its use for this purpose has been continued by all subsequent commissioners including the respondent. Each commissioner including the respondent has established rules and regulations in great detail, known as the statistical plan, to be used by the insurance companies for reporting to the bureau the data, statistics and information required for the fixing of classifications and premium charges. From the material thus collected the bureau has compiled and submitted to the commissioner information in much particularity with reference to the experience of the insurance companies under the compulsory insurance law. The data and statistics submitted by the bureau to the respondent constituted all the information necessary to enable him to fix pure premiums as the basis of the final premium charges for 1937. The term "pure premiums" means the amount necessary to have been paid on each motor vehicle to raise a fund equal to the incurred losses, which comprise the actual losses paid and the companies' estimates of outstanding unpaid losses. The determination of this factor is one of the steps in fixing rates.

There is a certain normal course of procedure in establishing rates under the compulsory insurance law which has been customarily followed by all commissioners. The several steps are (1) to determine whether the State shall be divided into rating territories with different rates for each, and if so how many; (2) to assign each city or town

to its appropriate territory on the basis of its loss experience; (3) to estimate the pure premiums or loss cost per vehicle for each territory for the year; (4) to determine what classification of vehicles shall be adopted in determining the pure premiums, and (5) to increase or load this pure premium by an amount estimated to be sufficient to pay the expenses of the company in carrying on its business plus a reasonable profit. The third is the only one of these steps in the conduct of the respondent now assailed. Hitherto the commissioners have used as the basic pure premiums of past experience the average of the last five years modified by a so called two-year rate level factor intended to change that average by the experience of the last two years. That method is based upon the recognition of the theory that, while a five-year experience is necessary to obtain a sufficiently broad basis in predicting the probable experience of the succeeding year, it does not give adequate weight to any trend in the course of losses, either upward or downward. The two-year rate level has been used in the determination of rates every year under the compulsory insurance law prior to 1937 since a five-year experience has been available. The master found that this was in accord with sound rate-making practice in this line of insurance and was necessary because of a definite upward trend in pure premiums based on actual experience under the compulsory insurance law. The respondent refused to adopt the so called two-year rate level. He also reduced by ten per cent the companies' estimate of the value of the outstanding claims against them for losses for the years prior to 1936, as reported to the bureau. His action in these two respects is assailed by the petitioners as being without justification and resulting in rates which are not "adequate, just, reasonable and non-discriminatory" within the meaning of those words in said § 113B.

The respondent caused an examination to be made of the files and records of various companies doing business under the compulsory insurance law. There is nothing in the record to show what the examiners did, or as to the dependability of any estimates made by them. The net

result of that examination was stated in the report of the chief examiner to be a reduction in the aggregate estimate of claims for outstanding and unpaid losses from $15,420,793 to $13,779,592. The respondent accepted the latter amount as accurate. He modified the figures for establishing the final rates accordingly. He used to that end what is termed a "reserve adjustment factor." The hearing before the respondent as required by said § 113B was held on September 19, 1936. An opportunity was given to all persons interested to be heard on the proposed rates. The stock insurance companies were heard somewhat at length. All the recommendations, studies, data and memoranda previously submitted to the respondent were formally introduced in evidence. So far as these were prepared or presented by the bureau pursuant to the statistical plan they plainly constituted evidence. The statistical plan was promulgated by the successive commissioners of insurance under the authority of said § 113B for the express purpose of securing reliable information. By the established practice of the parties it constituted evidence. Tabulations of data concerning expenses of the insurance companies were in evidence, prepared by the bureau, tending to show that the failure to adopt the two-year rate level and the reduction of the estimates of outstanding losses would result in inadequate premium charges. No evidence was introduced by or in behalf of the commissioner. The report of the investigation by his examiners was not introduced, nor was there any evidence tending to show overvaluation by the companies of their outstanding losses. There was no evidence at the hearing from which the two per cent "reserve adjustment factor" used by the respondent could be derived.

It is manifest from the answer of the respondent and from the report of the master that the respondent, in computing the rates established by him, used information not introduced in evidence at the hearing before him. The "reserve adjustment factor," if capable of support, depended upon the report of his examiners as to the reserve figures of the several insurance companies for protection against outstanding losses and alleged padding of returns.

No inquiry can be made upon this record as to that report because it was not in evidence at the hearing before the respondent required to be held by said § 113B. That report was in his files. That fact did not make it evidence at the hearing before him. "Nothing can be treated as evidence which is not introduced as such. . . . The matter improperly treated as evidence may have been an important factor in the conclusions reached . . . ." *United States* v. *Abilene & Southern Railway*, 265 U. S. 274, 288, 290. The words of said § 113B required the respondent to fix and establish the rates "after due hearing and investigation." It was said in *Interstate Commerce Commission* v. *Louisville & Nashville Railroad*, 227 U. S. 88, 91: "the statute gave the right to a full hearing, and that conferred the privilege of introducing testimony, and at the same time imposed the duty of deciding in accordance with the facts proved. A finding without evidence is arbitrary and baseless. And if the Government's contention is correct, it would mean . . . the Commission could disregard all rules of evidence, and capriciously make findings by administrative fiat." In *Baltimore & Ohio Railroad* v. *United States*, 264 U. S. 258, 264, 265, occurs this statement: "Congress by using the phrase 'whenever the Commission is of opinion, after hearing,' prescribed quasi-judicial action. . . . The provision for a hearing implies both the privilege of introducing evidence and the duty of deciding in accordance with it. To refuse to consider evidence introduced or to make an essential finding without supporting evidence is arbitrary action." The duty imposed upon the respondent carried with it fundamental procedural requirements. As was held in *Morgan* v. *United States*, 298 U. S. 468, 480, "There must be a full hearing. There must be evidence adequate to support pertinent and necessary findings of fact. Nothing can be treated as evidence which is not introduced as such. . . . The 'hearing' is designed to afford the safeguard that the one who decides shall be bound in good conscience to consider the evidence, to be guided by that alone, and to reach his conclusion uninfluenced by extraneous considerations which in other fields might have play in

determining purely executive action. The 'hearing' is the hearing of evidence and argument."

Although at the hearing before the master the report of the chief examiner was admitted in evidence, the master rightly ruled without objection by the respondent that it was admissible solely for the purpose of showing one of the documents upon which the respondent relied when he made his order fixing the rates for 1937 and that it was in no respect evidence of the truth of any statement of fact contained in it. The master states that there was no evidence as to who the subordinate examiners were, or as to their experience or knowledge or the manner in which they did their work, and that he could make no finding as to the dependability of any estimates made by them. Such a report manifestly cannot be evidence of the truth of its statements of facts.

The words of said § 113B empowering the commissioner to establish premium charges "after due hearing and investigation" do not authorize him to engage in an outside and independent research designed to elucidate new facts and to use the results thus obtained, without submitting them as evidence to the scrutiny of all parties in interest at the public hearing. The word "investigation" often connotes an inquiry according to judicial methods. *McCarthy* v. *Emerson*, 202 Mass. 352, 354. *Driscoll* v. *Mayor of Somerville*, 213 Mass. 493, 494. *Boston, petitioner*, 221 Mass. 468, 473. *MacDonald* v. *Street Commissioners*, 268 Mass. 288.

Doubtless the commissioner must make some investigation in order to prepare the schedule to be incorporated in the notice of the hearing. That schedule is tentative and is designed to direct the attention of interested parties to the subjects under inquiry and not to screen from discussion at the hearing the underlying basis for action already settled in his own mind but not disclosed in evidence. Without undertaking to limit unduly the scope of the word in this section, it is enough to say that it does not embrace and justify the conduct of the respondent here attacked.

It is provided by said § 113B that the court shall have

jurisdiction in equity to modify, amend, annul, or reverse any decision made by the commissioner at such hearing and to review all questions of law and fact involved. Without determining the scope of this jurisdiction it is plain that it cannot be exercised unless all the facts are presented in evidence before the commissioner to the end that there may be an understanding whether there is supporting proof for the order made by the commissioner.

The record shows that as to form and procedure the respondent in conducting the hearing and making his order fixing the premium rates did not conform to the provisions of said § 113B. He based his decision in an important particular upon matters not in evidence before him. He refused to grant a request for a ruling to the effect that in establishing premium charges for compulsory motor vehicle insurance he could not rightly use in his "computations as facts any data or figures not introduced in evidence at the hearing." That request was pertinent to the facts developed at the hearing. It is true that every presumption favors the regularity of the action of such a public officer as the respondent in the performance of his duty. *Brest* v. *Commissioner of Insurance*, 270 Mass. 7, 17. But the irregularity of the respondent with respect to the hearing strikes at the vitals of fundamental rights.

The master has made elaborate findings as to the rates which the respondent ought to have established. The petitioners invoke the jurisdiction of the court to establish these rates in place of those contained in the order of the respondent. They urge that power to "modify, amend, annul, reverse or affirm" the order of the commissioner and "make any appropriate order or decree" is broad enough to warrant such action. In general the fixing of rates for public service is a legislative and not a judicial act. *Donham* v. *Public Service Commissioners*, 232 Mass. 309. *Opinion of the Justices*, 251 Mass. 569, 610, 611. *Boston & Albany Railroad* v. *New York Central Railroad*, 256 Mass. 600, 618, 619. *St. Joseph Stock Yards Co.* v. *United States*, 298 U. S. 38, 50–51. *Knoxville* v. *Knoxville Water Co.* 212 U. S. 1, 8. We are not unmindful of the leading case of *Janvrin,*

*petitioner*, 174 Mass. 514. But the principle there expounded does not justify the course here urged.

It becomes unnecessary to consider the other questions argued. The result is that the order of the respondent made on September 21, 1936, fixing the classification of risks and insurance premium charges must be annulled. That entry may be in the petition in equity brought under said § 113B, together with costs in favor of the petitioners. In the suit in equity the entry may be, bill dismissed without prejudice.

*Ordered accordingly.*