**AMERICAN EAGLE FIRE INS. CO. et al. v. JORDAN et al.**

**Civ. A. No. 33332.**

District Court of the United States for the District of Columbia.

June 25, 1946.

Powers, Kaplan & Berger, of New York City, and Cromelin, Townsend, Camalier & Kirkland, of Washington, D. C. (Abraham Kaplan and George I. Gross, both of New York City, and Paul B. Cromelin and Francis C. Brooke, both of Washington, D. C., of counsel), for plaintiffs.

Vernon E. West, Corporation Counsel, Lloyd B. Harrison, Sp. Asst. Corporation Counsel, and Oliver Gasch, Asst. Corporation Counsel, all of Washington, D. C., for defendant Jordan.

Walter M. Bastian, of Washington, D. C., for defendant Insurance Rating Bureau of District of Columbia.

HOLTZOFF, Justice.

This is an action by a group of fire insurance companies to enjoin the enforcement of an order of the Superintendent of Insurance of the District of Columbia, adjusting and fixing fire insurance rates.

By the Act of Congress of June 1, 1944,[1]

---

[1] 58 Stat. 267, Sections 2 and 3, District of Columbia Code, 1940 Ed. Secs. 35—1402 and 35—1403, which read as follows:

Sec. 35—1402. "The provisions of this chapter shall apply to insurance in the District of Columbia against loss of or damage to property or any valuable in-

the Superintendent of Insurance of the District of Columbia was empowered to investigate the necessity for an adjustment of the rates on fire, lighting, tornado, windstorm, and explosion insurance, and to order an adjustment of the rates whenever he determined that they were excessive, inadequate, or unreasonable. Any person aggrieved by such an order of the Superintendent may appeal to the Commissioners of the District of Columbia, or contest its validity in any court of competent jurisdiction by appeal, or through any other appropriate proceedings.

Acting under the authority of this statute, the Superintendent of Insurance on October 29, 1945, promulgated an order reducing fire insurance rates. This order was modified by a supplemental order issued on February 1, 1946, by which the reduction was made somewhat smaller than by the original order. Thereupon, this suit was brought by a number of fire insurance companies doing business in the District of Columbia, to enjoin the enforcement of the amended order and to secure an adjudication that it is of no force and effect. Out of the 234 fire insurance companies doing business in the District of Columbia, 173 are plaintiffs in this action.

The order sought to be reviewed con-stitutes the first attempt on the part of the Superintendent of Insurance of the District of Columbia to exercise the rate-making authority conferred on him by the Act of June 1, 1944. Consequently, this case is one of first impression.

The plaintiffs assert that the order of the Superintendent should be set aside and it enforcement enjoined on several grounds. First, it is contended that the Superintendent's failure to accord a hearing to the interested parties, and to take evidence as a basis for his order, was illegal and contrary to the requirements of the statute, if properly construed. Second, it is alleged that the rates fixed by the Superintendent are confiscatory and, therefore, constitute a taking of property without due process of law. Third, it is urged that some of the basic computations on which the Superintendent predicated his action were erroneous. Each of these grounds will be separately considered.

## I. Lack of Hearing

Some time prior to the issuance of his order of October 29, 1945, the Superintendent of Insurance sent a questionnaire to every fire insurance company doing business in the District of Columbia, calling for certain information relating to its ac-

---

terest therein by or as a consequence of fire, lightning, tornado, windstorm, and explosion, or any one or more of such hazards, including all supplemental, additional, or extended forms of coverage written in connection with fire insurance, and including any policy which insures property, while it is at a permanent location, against the hazard of fire, lightning, tornado, windstorm, or explosion; but this chapter shall not apply to ocean marine, transportation, boiler and machinery, or motor-vehicle insurance, nor to insurance covering the property of interstate common carriers, nor to any form of insurance designated by the Superintendent as inland marine insurance."

Sec. 35—1403. "The Superintendent is empowered to investigate the necessity for an adjustment of the rates on any or all risks or classes of risks within the scope of this chapter, and to order an adjustment of such rates whenever he determines, after investigation of the experience showing premiums and losses for a period of not less than five years next preceding such investigation, that the rates for any one or more classes of risks are excessive, inadequate, or unreasonable. In determining the necessity for an adjustment of rates, the Superintendent shall give consideration to all factors reasonably attributable to the risks, to the conflagration or catastrophe hazard, both within and without the District, and to a reasonable profit. The Superintendent is also empowered, after investigation, to order removed, at such time and in such manner as he shall specify, any unfair discrimination existing between individual risks or classes of risks.

"Any person, firm, or corporation aggrieved by any order, ruling, proceeding, or action of the Superintendent, or any person acting in his behalf and at his instance, may appeal to the Commissioners of the District, or contest the validity of such order, ruling, proceeding, or action in any court of competent jurisdiction by appeal or through any other appropriate proceedings, as provided under sections 35-1348 and 35-1349."

tivities. The companies were not apprized of the purpose for which the replies were to be used. After examining the responses and consulting and considering such other data as he deemed wise, the Superintendent issued an order on October 29, 1945, directing that fire insurance rates prevailing in the District of Columbia be reduced by at least 5.8260%, so as to effect an annual reduction of not less than $134,273 in the aggregate amount of premiums.

No formal proceedings had been instituted or conducted by the Superintendent, no hearing had been held or accorded to interested parties, and no notice of an intention on the part of the Superintendent to revise rates had been given to any one. The order appears to have been issued in a purely ex-parte manner. After the order was promulgated, some of the companies affected by it requested an opportunity to be heard and to present contravening data with a view to securing a modification of the reduction of rates. The companies were then permitted to submit information informally. The Superintendent and his counsel, however, expressly took the position that this opportunity was extended to the companies as a matter of grace and not as a matter of right, and that he had the authority to proceed without any hearing. A supplemental order, dated February 1, 1946, was subsequently issued by the Superintendent modifying the original order by directing a rate reduction of at least 5%, so as to effect an annual reduction of not less than $115,236.

It is contended by the companies that the mode of procedure adopted and followed by the Superintendent was illegal. They urge that they were entitled to a hearing; that the Superintendent was obligated to proceed on the basis of evidence adduced by his counsel in his behalf, and countervailing evidence introduced by the companies and any other interested parties; and that a record of such evidence should have been made, and should have formed a basis for findings of fact, which in turn should have constituted the foundation for any order fixing rates. On the other hand, it is the Superintendent's position that the statute does not require him to proceed by formal hearings, but that he is empowered to act on the basis of an ex parte informal investigation and his personal knowledge, without any representation on behalf of interested parties.

A determination of this important issue requires a consideration of the nature of the administrative process as distinguished from the judicial process. Basically the judicial process is a means for determining a controversy between two or more named persons by an impartial tribunal. The administrative process, as applied in connection with regulatory activities of the Government, and more particularly, regulation of rates is a means by which a Governmental agency clothed with delegated legislative authority or performing a quasi judicial function, regulates activities of groups of persons within specified channels. In its operation the judicial process contemplates a proceeding in which each party is represented in person or by counsel, with the tribunal acting as an arbiter. The administrative process envisages a proceeding in which the regulatory body may be represented before itself by its own counsel, who presents evidence in support of an action which he suggests that the agency should take, while parties who may be affected by the proposed action may be heard in person or by counsel. In one case, there is a determination of a controversy by an impartial tribunal, while in the other instance, the regulatory agency or officer is in part an interested party and in part a trier of the respective contentions advanced by its counsel and the counsel for other parties represented at the hearing.

The difference between the two types of process become more apparent in connection with proceedings to review the determinations reached. In case of the judicial process, review is had by appropriate appellate proceedings in a higher court. The trial court has no interest or participation in the subsequent steps. On the other hand, in case of the administrative process, the administrative agency becomes the respondent or defendant in judicial proceedings seeking to review the administrative order, and through its counsel seeks to sustain the administrative action.

In spite of the differences that exist between the judicial and the administrative process, both have certain elements in common. One of these features is that each must comply with the requirements of due process of law, and must pursue procedure that does not transcent these limitations. Due process of law is a process that hears before it condemns. The requirement of a hearing is one of the fundamental principles imbedded in Anglo-American jurisprudence. It is as inexorable a requirement in administrative proceedings involving delegated legislative authority or a quasi judicial function, as it is in the determination of controversies in courts of law. It is axiomatic that to adjudicate personal or property rights without giving interested parties an opportunity to be heard is contrary to our basic ideas of substantial justice. No encroachment or inroad should be permitted or tolerated in respect to an indispensable safeguard so vital and precious as the right to a hearing before final adjudication.

It has been held by an unbroken line of authorities that an administrative agency, in establishing a basis for regulatory action, particularly an order fixing rates, is under an obligation to give notice and to accord a fair and full hearing to all interested parties, to take evidence, to make findings of fact based solely on such record, and to predicate its final conclusion on the findings of fact. In Ohio Bell Tel. Co. v. Public Utilities Comm., 301 U.S. 292, 57 S.Ct. 724, 81 L.Ed. 1093, the Public Utilities Commission of Ohio instituted a proceeding to fix the valuation of property of telephone companies as of 1925 and to adjust rates as of that date. After the completion of the proceeding, the Commission made a further order fixing the values of the property for each year from 1926 to 1933, without taking any evidence on this aspect of the matter. The Supreme Court held that the action of the Commission was invalid, because of its failure to hold a hearing on this phase of the subject, and because of the fact that it proceeded without taking any evidence. In writing for a unanimous court, Mr. Justice Cardozo, in his usual trenchant style, made the following remarks (301 U.S. at pages 302–305, 57 S.Ct. at page 729, 81 L.Ed. 1093):

"From the standpoint of due process— the protection of the individual against arbitrary action—a deeper vice is this, that even now we do not know the particular or evidential facts of which the Commission took judicial notice and on which it rested its conclusion. Not only are the facts unknown; there is no way to find them out. When price lists or trade journals or even government reports are put in evidence upon a trial, the party against whom they are offered may see the evidence or hear it and parry its effect. Even if they are copied in the findings without preliminary proof, there is at least an opportunity in connection with a judicial review of the decision to challenge the deductions made from them. The opportunity is excluded here. The Commission, withholding from the record the evidential facts that it has gathered here and there, contents itself with saying that in gathering them it went to journals and tax lists, as if a judge were to tell us, 'I looked at the statistics in the Library of Congress, and they teach me thus and so.' This will never do if hearings and appeals are to be more than empty forms.

\*      \*      \*      \*      \*      \*

"To put the problem more concretely: how was it possible for the appellate court to review the law and the facts and intelligently decide that the findings of the Commission were supported by the evidence when the evidence that it approved was unkown and unknowable?"

\*      \*      \*      \*      \*      \*

"Regulatory commissions have been invested with broad powers within the sphere of duty assigned to them by law.

\*      \*      \*      \*      \*      \*

All the more insistent is the need, when power has been bestowed so freely, that the 'inexorable safeguard' (St. Joseph Stock Yards Co. v. United States, 298 U.S. 38, 73, 56 S.Ct. 720, 735, 80 L.Ed. 1033) of a fair and open hearing be maintained in its integrity. Morgan v. United States, 298 U.S. 468, 480, 481, 56 S.Ct. 906, 911, 80 L. Ed. 1288; Interstate Commerce Comm. v. Louisville & N. R. Co. [227 U.S. 88, 91, 33

S.Ct. 185, 57 L.Ed. 431]. The right to such a hearing is one of 'the rudiments of fair play' (Chicago, M. & St. P. R. Co. v. Polt, 232 U.S. 165, 168, 34 S.Ct. 301, 58 L. Ed. 554) assured to every litigant by the Fourteenth Amendment as a minimal requirement. West Ohio Gas Co. v. Public Utilities Comm. (No. 1), [294 U.S. 63, 55 S.Ct. 316, 79 L.Ed. 761] (No. 2) [294 U.S. 79, 55 S.Ct. 324, 79 L.Ed. 773], supra; Brinkerhoff-Faris Trust & Savings Co. v. Hill, 281 U.S. 673, 682, 50 S.Ct. 451, 454, 74 L.Ed. 1107. Cf. Norwegian Nitrogen [Products] Co. v. United States, supra [288 U. S. 294, 53 S.Ct. 350, 77 L.Ed. 796]. There can be no compromise on the footing of convenience or expediency, or because of a natural desire to be rid of harassing delay, when that minimal requirement has been neglected or ignored."

In Railroad Comm. v. Pacific Gas Co., 302 U.S. 388, 58 S.Ct. 334, 82 L.Ed. 319, the Supreme Court passed on the validity of a rate-making order of the Railroad Commission of the State of California. One of the attacks directed against the order was based on the contention that the Commission had failed to comply with the requirement of procedural due process. The Supreme Court, speaking through Chief Justice Hughes, enunciated the following principles as a guide to administrative bodies and officers (302 U.S. at page 393, 58 S.Ct. at page 338, 82 L.Ed. 319) : "The right to a fair and open hearing is one of the rudiments of fair play assured to every litigant by the Federal Constitution as a minimal requirement. Ohio Bell Telephone Co. v. Public Utilities Comm., 301 U.S. 292, 304, 305, 57 S.Ct. 724, 730, 81 L. Ed. 1093. There must be due notice and an opportunity to be heard, the procedure must be consistent with the essentials of a fair trial, and the Commission must act upon evidence and not arbitrarily."

In Interstate Commerce Comm. v. Louisville & N. R. Co., 227 U.S. 88, 91, 33 S.Ct. 185, 57 L.Ed. 431, it was stated that admin-

istrative orders, quasi judicial in character, were void if a hearing was denied. This point had been definitely determined by the United States Court of Appeals for the District of Columbia. In Clarksburg-Columbus Short Route B. Co. v. Woodring, 67 App.D.C. 44, 89 F.2d 788, the Court had under consideration an order made by the Secretary of War fixing bridge tolls pursuant to a statutory provision authorizing such action on his part. The statute did not require the Secretary of War to conduct a hearing.[2] Nevertheless, the court reached the conclusion that his failure to do so vitiated his action. On this point, the court made the following significant observations (67 App.D.C. at page 46, 89 F.2d at page 790) : "The right to notice and hearing is imperative in judicial or quasi judicial proceedings. It is not important that in this instance a hearing is not expressly enjoined by the statute. The right is constitutional, and the deprivation of the citizen of his property without notice and an opportunity to be heard amounts to the taking of his property without due process of law (Const.Amend. 5)."

The emphasis placed by the courts on the necessity for a hearing in administrative proceedings of the type involved in this litigation is well illustrated in United States v. Illinois Central R. Co., 291 U.S. 457, 54 S.Ct. 471, 78 L.Ed. 909. In that case a group of railroads brought suit to set aside an order of the Interstate Commerce Commission made under the Inland Waterways Corporation Act, which authorized the Commission to regulate common carrier service on certain designated waters. The Commission issued an order directing specified carriers to establish through barge-rail routes and rates. The order was assailed on the ground that it had been made without a full and fair hearing, and that the statute, insofar as it authorized the Commission to proceed without such hearing, contravened the due process clause of the Fifth Amendment. The Court overruled this contention, but solely

---

[2] The statute involved in the cited case (33 U.S.C.A. § 494) is composed of two distinct provisions: first, it authorizes the Secretary of War to require removal of obstructions to navigation; and second, it empowers him to fix bridge tolls. The first provision required him to proceed on the basis of a hearing, while the second contained no such requirement.

on the ground that the Commission had construed the statute as requiring it to accord a hearing after the making of the order, but before putting it into effect. In fact, the Government conceded that the order could not have been enforced without a hearing, if properly sought by the carriers affected thereby. The Supreme Court made the following comments on this aspect of the case (291 U.S. at pages 460, 461, 54 S. Ct. at page 472, 78 L.Ed. 909): "The provision of the statute that a certificate of public convenience and necessity to conduct a common carrier service upon the waters designated may be obtained upon application to the commission and *thereupon* the commission shall make the order described in the statute, undoubtedly empowers the commission to make the order, in the first instance, without a hearing. The commission, however, seems never to have held that it is not obliged upon complaint to grant a full and fair hearing after the making of the order but before putting it into effect. And both in the briefs filed on behalf of appellants, including the United States and the commission, and in the argument at the bar, the position is definitely taken that the order is tentative and the rates prescribed thereby cannot be enforced without a hearing if properly sought by appellees."

To be sure in the instant case, the Superintendent, after making his order, accorded to the companies at their request an opportunity to submit data informally. He expressly took the position, however, that he was doing so solely as a matter of grace; that he was not obligated to do so; and that the companies had no right to demand or insist upon a hearing or an opportunity to present evidence or argument, unless as a matter of discretion he chose to extend them the privilege. In fact, counsel for the Superintendent urge that he proceeded on his personal knowledge of "intimate details of company operations and practices", obtained from reports made by his examiners. Counsel further state that "in their oral reports to the Superintendent they (i.e., the examiners) very properly report to him with complete freedom". Unfortunately, however, this information is not spread on the record of this proceeding. The com-

panies presumably do not know what it is, and, hence are unable to answer it. This ex parte procedure is repugnant to our basic ideas of justice and is inconsistent with the elementary requirements of due process of law. One's rights may not be adjudicated on the basis of facts not made known to him and which he has no opportunity to answer or explain. The right of judicial review is also, in part at least, frustrated, since this information has not been made available to the court. The fact that obviously the Superintendent acted in good faith and in all sincerity and that he performed his task in a thorough and intelligent manner does not save his course of action from the fatal consequence of the vital deficiencies of his procedure.

The authorities on which the Superintendent relies in support of his position are distinguishable. Phillips v. Commissioner, 283 U.S. 589, 51 S.Ct. 608, 75 L.Ed. 1289; Springer v. United States, 102 U.S. 586, 26 L.Ed. 253; and Bi-Metallic Inv. Co. v. State Board of Equalization of Colorado, 239 U.S. 441, 36 S.Ct. 141, 60 L.Ed. 372, are cases involving the validity of tax levies. It is well established, however, that summary procedure is permissible in the collection of the revenue. In fact, in Phillips v. Commissioner, supra, Mr. Justice Brandeis observed that, "The right of the United States to collect its internal revenue by summary administrative proceedings has long been settled." 283 U.S. at page 595, 51 S.Ct. at page 611, 75 L.Ed. 1289. Manifestly, these cases do not govern the course that must be pursued in rate-making proceedings, since they are governed by entirely different principles.

Bailey v. Anderson, 326 U.S. 203, 205, 66 S.Ct. 66, merely reaffirms the well-known principle that in a condemnation proceeding the entry on the property may precede the hearing on the issue of just compensation.

Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892, involved the validity of the Emergency Price Control Act, 50 U.S.C.A.Appendix, § 901 et seq. The Supreme Court sustained the validity of the statute as an emergency measure enacted in the exercise of the war powers.

That this is the correct view of this decision appears from the following observations in the majority opinion of Mr. Justice Douglas (321 U.S. at pages 520, 521, 64 S.Ct. at page 650, 88 L.Ed. 892): "Congress was dealing here with the exigencies of wartime conditions and the insistent demands of inflation control. * * * National security might not be able to afford the luxuries of litigation and the long delays which preliminary hearings traditionally have entailed."

Obviously, no such conditions are presented in the instant case. None of the other authorities cited by counsel for the Superintendent bear on the precise point here in issue.

■ It is a well settled principle of statutory construction that if an enactment is capable of two possible meanings, one of which would give rise to a serious doubt or to a grave question of constitutionality, while the other would render the statute palpably valid, the latter interpretation should be adopted, Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598; The Abby Dodge, 223 U.S. 166, 32 S.Ct. 310, 56 L.Ed. 390; Arkansas Natural Gas Co. v. Arkansas Railroad Comm., 261 U.S. 379, 383, 43 S.Ct. 387, 67 L.Ed. 705; United States v. Delaware & Hudson Co., 213 U.S. 366, 408, 29 S. Ct. 527, 53 L.Ed. 836.

In Crowell v. Benson, supra, Chief Justice Hughes made the following significant remarks: "When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." 285 U.S. at page 62, 52 S.Ct. at page 296, 76 L.Ed. 598.

■■ The statute here under consideration empowers the Superintendent to investigate the necessity for an adjustment of rates and to order an adjustment whenever he determines "after investigation" that the rates are excessive, inadequate, or unreasonable. The foregoing discussion irresistibly leads to the conclusion that the word "investigation" as used in the Act, means a proceeding in which a full and fair hearing is accorded to all interested parties, evidence is taken, a record is made, and findings of fact are reached on the basis of the record. The final order of the Superintendent must be based on findings of fact derived in this manner. The term "investigation" as used in this statute is not to be interpreted in its loose, popular, or colloquial sense, as an informal, ex parte, examination of such data as the Superintendent may secure through his own efforts in the exercise of his own discretion, without disclosing this information to any one and without according an opportunity to the persons concerned to meet the information obtained by him.

This conclusion was reached by the Supreme Judicial Court of Massachusetts, in American Employers' Ins. Co. v. Com'r of Insurance, 298 Mass. 161, 168, 10 N.E.2d 76, in construing a somewhat similar State statute. That court stated (298 Mass. at page 168, 10 N.E.2d at page 81): "The words of said section 113B empowering the commissioner to establish premium charges 'after due hearing and investigation' do not authorize him to engage in an outside and independent research designed to elucidate new facts and to use the results thus obtained, without submitting them as evidence to the scrutiny of all parties in interest at the public hearing. The word 'investigation' often connotes an inquiry according to judicial methods."

The vital defect in the procedure adopted by the Superintendent is graphically and vividly illustrated by the dispute between the parties over the proper expense ratio which should be employed in computing the amount of expenses with which the Companies are to be credited. The companies contend that 48.29% of the earned premiums is the ratio that should have been adopted for that purpose. The figure actually employed by the Superintendent was 43.50%. Obviously, the Superintendent is clothed with a broad discretion in determining this ratio, as well as all other factors that enter into fixing a reasonable rate. Nevertheless, there was no evidence adduced before the Superintendent, either by his own counsel, or by any interested party, which warranted him in arriving at this or any other figure.

His deputy testified that it was a "judgment figure". Obviously, however, judgment must be based on evidence. It is admitted that 48.29%—the figure advanced by the companies,—represents the average expense ratio of all companies licensed to write fire insurance in the District of Columbia in 1944. The figure 43.50% is reached by the following calculation: if all companies with a higher expense ratio than the average of 48.29% are credited with only 48.29% and a re-computation is made on this basis, the average expense ratio becomes 43.50%. The testimony in behalf of the Superintendent shows that he did not reach his result by employing this method of calculation, but, as previously stated, the figure used by him was arrived at by the exercise of his judgment and discretion. The coincidence is, however, present. The fact remains that the ratio used by him excludes all higher expense ratios of companies whose expenses exceed 48.29% of the earned premiums. Manifestly, it may hardly be contended that the Superintendent was obligated to accept the expense ratio of each company, no matter how high it may be. In order to exclude all higher expense ratios, however, there should have been some evidence justifying such a result. No such showing is made here. For example, it does not appear that the companies with a higher expense ratio were wilfully extravagant, or inefficiently managed, or that their expenses were excessive, or that there was some other reason why they should not be included in the computation. If a full and fair hearing had been held at which pertinent evidence had been adduced and if the Superintendent had acted on the evidence thus presented, it may well be that the expense ratio employed by him might be justified, or, on the other hand, the opposite conclusion might be reached. Unfortunately, however, there is no evidence on the basis of which the court is in a position to review his conclusions.

This aspect of the case is of considerable importance. It is contended by the companies that a large portion of their expenses, such as agents' commissions, taxes, license fees, and the like, cannot be controlled by them, and that the variable expenses over which they have some modicum of control represent a comparatively small fraction of the aggregate. They assert that the reduction of five points in the expense ratio amounts to almost a 50% reduction of the total expenses in the controllable group.

The pungent remarks of Mr. Justice Brandeis in Northern Pacific R. Co. v. Dept. of Public Works, 268 U.S. 39, 44, 45, 45 S.Ct. 412, 414, 69 L.Ed. 636, are peculiarly applicable to this phase of the case at bar: "The mere admission by an administrative tribunal of matter which under the rules of evidence applicable to judicial proceedings would be deemed incompetent (United States v. Abilene & Southern R. Co., 265 U.S. 274, 288, 44 S.Ct. 565, 68 L.Ed. 1016), or mere error in reasoning upon evidence introduced, does not invalidate an order. But where rates found by a regulatory body to be compensatory are attacked as being confiscatory, courts may inquire into the method by which its conclusion was reached. An order based upon a finding made without evidence (The Chicago Junction Case, 264 U.S. 258, 263, 44 S.Ct. 317, 68 L.Ed. 667), or upon a finding made upon evidence which clearly does not support it (Interstate Commerce Commission v. Union Pacific R.R., 222 U.S. 541, 547, 32 S.Ct. 108, 56 L.Ed. 308), is an arbitrary act against which courts afford relief. The error under discussion was of this character. It was a denial of due process."

## II. Confiscation

The companies claim that the rates fixed by the Superintendent are confiscatory and, therefore, result in taking property without due process of law, in contravention of the Fifth Amendment. They contend that if the rates are enforced, the average rate of underwriting profit that prevailed during the five year period from 1940 to 1944, inclusive, would be transformed into an average underwriting loss of 2.50%. They attempt to support their contention by recalculating the prospective earned premiums of all of the companies on a basis different from that used by the Superintendent. They deduct from this

amount the aggregate, estimated, actual expenses of all of the companies, calculated on the basis of an expense ratio of 48.29%. After deducting this amount as well as an estimated amount of insurance losses, they reach a result indicating that the companies would sustain an annual underwriting loss of $257,385, or 2.50% of the total premiums. There is no showing of the effect of the order on any individual company.

It is well settled that a person claiming to be aggrieved by a rate making order has the burden of proof on the issue of confiscation. To sustain this burden, he must establish by clear and convincing evidence that the rates make it impossible to earn a fair return, American Toll Bridge Co. v. Railroad Comm., 307 U.S. 486, 494, 59 S.Ct. 948, 83 L.Ed. 1414; Los Angeles Gas Co. v. Railroad Comm., 289 U.S. 287, 305, 53 S.Ct. 637, 77 L.Ed. 1180; Lindheimer v. Illinois Bell Tel. Co., 292 U.S. 151, 164, 54 S.Ct. 658, 78 L.Ed. 1182. In Lindheimer v. Illinois Bell Tel. Co., supra, Chief Justice Hughes remarked that "The question is whether the company has established, with the clarity and definiteness befitting the cause, that this reduction would bring about confiscation." 292 U.S. at page 164, 54 S.Ct. at page 663, 78 L.Ed. 1182.

It has been frequently held that in case of rate fixing orders, affecting a group of persons, any person claiming to be aggrieved must establish individually that the rate as to him will result in confiscation. It is not sufficient for him to demonstrate that as a whole the rate leads to an unreasonably low rate of return for the average company.

In Missouri Rate Cases (Knott v. Chicago, B. & O. R. Co.), 230 U.S. 474, 508, 33 S.Ct. 975, 57 L.Ed. 1571, the court passed upon the validity of rates affecting a group of railroad companies. It was contended that the rates were confiscatory, in that they did not enable some of the railroads to earn a fair return. The court overruled this contention and stated in an opinion by Mr. Justice Hughes (230 U.S. at page 508, 33 S.Ct. at page 983): "The contention raised by the complainants, that these legislative acts cannot be enforced against one company unless enforced against all, cannot be sustained. The argument, in effect, is that, although the charges of carriers may be clearly exorbitant, the state is powerless to compel them to put into effect reasonable rates because, as to another carrier differently situated, the rates thus prescribed might be unreasonably low. The acts are valid upon their face as a proper exercise of governmental authority in the establishment of reasonable rates, and each complainant, in order to succeed in assailing them, must show that as to it the rates are confiscatory."

In Minnesota Rate Cases (Simpson v. Shepard), 230 U.S. 352, 467-473, 33 S.Ct. 729, 57 L.Ed. 1511, 48 L.R.A.,N.S., 1151, Ann.Cas.1916A, 18, rates had been fixed by a rate-making body affecting three railroad systems. They were held confiscatory as to one of the roads, but valid as to the other two.

In Ætna Insurance Co. v. Hyde, 275 U.S. 440, 446, 48 S.Ct. 174, 176, 72 L.Ed. 357, the Supreme Court passed on the validity of a rate fixing order of the Superintendent of Insurance of the State of Missouri. In that case, too, the contention was advanced that the rate was confiscatory in that it was too low as to some of the companies. In overruling this contention, Mr. Justice Butler wrote as follows: "No company receiving just compensation is entitled to have higher rates merely because of the plight of its less fortunate competitors. Companies whose constitutional rights are not infringed may not better their position by urging the cause of others."

In the case at bar, there is no showing, in fact there has been no attempt to prove, how the rates affected individual companies. In order to sustain the burden of proof that the rates are confiscatory, it is incumbent upon individual companies to demonstrate that the result would be confiscatory as to them. A speculative and conjectural calculation based on the average of all companies involved, is not sufficient. In the light of the foregoing considerations, the court reaches the conclusion that the plaintiffs have not sus-

86

tained their contention that the rates fixed by the Superintendent of Insurance are confiscatory.

### III. Miscellaneous Objections.

The plaintiffs further contend that certain of the basic factors that necessarily enter into the fixing of rates, were computed by the Superintendent of Insurance on an erroneous and improper basis. In the light of the disposition about to be reached, it does not appear pertinent to pass on these objections at this time, since the order of the Superintendent will be set aside for failure to comply with the basic requirement of a fair and full hearing. At such a hearing, counsel for the Superintendent, as well as counsel for all interested parties will be in a position to offer evidence on these disputed issues, and for this reason, it seems best to not prejudge them.

The order of the Superintendent will be set aside and its enforcement will be restrained because of his failure to proceed in the manner indicated in this opinion.

Judgment for the plaintiffs. Counsel will submit suggested findings of fact and conclusions of law in accord with this opinion.